UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM H. DAVIS, IN HIS CAPACITY AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JASON H. DAVIS,<br><br>PLAINTIFF<br><br>v.<br><br>MAURA T. HEALEY, IN HER PERSONAL CAPACITY FOR ACTIONS AND OMISSIONS ENGAGED IN BY HER, UNDER COLOR OF STATE LAW, WHILE ACTING AS THE DULY ELECTED GOVERNOR OF THE COMMONWEALTH OF MASSSACHUSETTS,<br><br>DEFENDANT | CIVIL ACTION NO.<br><br><br>**COMPLAINT AND JURY CLAIM** |

## SUBJECT MATTER JURISDICTION

This Court has subject matter jurisdiction under 28 U.S.C. §1331, 28 U.S.C. §1343 and 42 U.S.C. §1983.

## VENUE AND PERSONAL JURISDICTION

Venue is proper and personal jurisdiction exists in the Eastern Division of this District, in accord with LR (D. Mass) 40.1 (c)(1), 28 U.S.C. §1391 (c)(1) and the Due Process Clause ("Due Process Clause") of the Fourteenth Amendment to the United States Constitution, since the Plaintiff Estate is a resident of Middlesex County, Massachusetts, the Defendant, Maura Healey, is a resident of Middlesex County, Massachusetts and the incident, which gives rise to the instant action, occurred in Boston, Suffolk County, Massachusetts. Thus, all parties reside in the Eastern

Division of this District and specific and general personal jurisdiction exists in it as well in accord with the cited authorities.

## FACTS COMMON TO ALL COUNTS

1.  The Plaintiff ("Plaintiff," "Davis Estate" or "Jason Davis") incorporates herein by reference all paragraphs hereinbefore and hereinafter set forth as if specifically set forth herein.

2.  Each paragraph of this Complaint incorporates each remaining paragraph of this Complaint.

3.  Each of the contemporaneously filed sixty-four (64) exhibits are attached hereto, expressly incorporated into each paragraph of this Complaint and will be referenced by the pertinent exhibit number and page; e.g. (2/1-8).

4.  The Plaintiff, William H. Davis, in his capacity as the Personal Representative of the Estate of Jason H. Davis ("Jason Davis"), is a male person who resides in Scranton, Lackawanna County, Commonwealth of Pennsylvania.

5.  William H. Davis is the 86 year old biological father of Jason Davis who has been pursing justice for his son for 30 years.

6.  The Davis Estate is a resident of Middlesex County, Massachusetts.

7.  The Defendant, Maura T. Healey ("Defendant" or "Governor Healey"), is the Chief Executive Officer of the Executive Branch within the Commonwealth of Massachusetts under and pursuant to the Massachusetts Constitution.

8.  The Defendant is the sitting and duly elected Governor of the Commonwealth of Massachusetts under and pursuant to the Massachusetts Constitution.

9.     The Defendant has been continuously employed in Boston, Suffolk County, Massachusetts by the Commonwealth of Massachusetts, as its Governor, since on or about January 5, 2023.

10.     The Defendant has been a licensed Massachusetts attorney since on or about December 15, 1998.

11.     The Defendant continuously practiced law in Massachusetts from on or about 1998 to on or about January 4, 2023.

12.     The Defendant was elected and practiced law as the sitting Attorney General for the Commonwealth of Massachusetts from January, 2015 through January 4, 2023.

13.     The Defendant practiced law as an Assistant Attorney General for the Commonwealth of Massachusetts from on or about 2007 to on or about 2015.

14.     The Defendant, in her prior capacity as Attorney General, was the lead law enforcement official for the Commonwealth of Massachusetts, pursuant to and under the Massachusetts Constitution, from 2015 to 2023.

15.     The Defendant, in her prior capacity as Attorney General, operated a Civil Rights Bureau which litigated civil rights cases in the United States Supreme Court ("Supreme Court") amongst other courts.

16.     The Defendant, in her prior capacity as Assistant Attorney General, was the head of the Civil Rights Bureau at the Massachusetts Attorney General's Office.

17.     Throughout her legal career the Defendant has litigated legal issues attendant to the First, Second, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

18. Throughout her legal career the Defendant has been a civil rights attorney insofar as she has continuously litigated issues attendant to the recited amendments to the United States Constitution.

19. At all times material herein the Defendant acted for and on behalf of the Commonwealth of Massachusetts.

20. At all times material herein the Defendant held herself out to be a Civil Rights Advocate.

21. Jason Davis was born in 1965.

22. Jason Davis died on June 14, 2004 at age 38.

23. On August 12, 1993 Jason Davis was a 28 year old acutely mentally ill and involuntarily committed inpatient housed within a locked ward at the Westborough State Hospital facility ("Hospital") which was then operated by the Massachusetts Department of Mental health ("DMH"). See Davis v. Rennie, 997 F. Supp. 137 (D. Mass. 1998); Davis v. Rennie, 264 F. 3d 86 (1st Cir. 2001); Davis v. Rennie, 535 U.S. 1053 (2002); Davis v. Rennie, 178 F. Supp. 2d 28 (D. Mass. 2001); Davis v. Coakley, 802 F. 3d 128 (1st Cir. 2015); (21/1-2).

24. Jason Davis then suffered from a variety of acute psychiatric disorders including Schizoaffective Disorder, Bipolar Type I, Polysubstance Abuse and Acute Depression. Davis, 997 F. Supp., at 137 – 140; Davis, 264 F. 3d, at 91.

25. Jason Davis had been periodically institutionalized for his psychiatric disorders for nearly all of his adult life. Id., at 91.

26. The DMH is subject to the supervision and control of the Massachusetts Secretary of Health and Human Services.

27. The Massachusetts Secretary of Health and Human Services is one of twelve (12) Cabinet positions of the Massachusetts Chief Executive Officer (Governor).

28. The Massachusetts Secretary of Health and Human Services is an Executive Branch Constitutional Officer.

29. When Jason Davis was an involuntarily committed inpatient at the Hospital the Commonwealth of Massachusetts, in particular its Executive Branch, had a federal constitutional obligation to physically protect him from harm by staff and otherwise insure that he was not subject to punishment, not held in unsafe conditions, provided with reasonable non-restrictive conditions of confinement, provided with the right to be free from unjustified intrusions on his personal security, provided with adequate medical care, provided with adequate nutrition and provided with the right to be free from unreasonable bodily restraints. See Youngberg v. Romeo, 457 U.S. 307, 314 - 324. (1989); Davis, 264 F. 3d, at 98-99; Deshaney v. Winnebago County Department of Social Services, 489 U.S. 189, 199 – 200 (1989).

30. The Commonwealth utterly failed to protect Jason Davis from physical violence by staff, as the Constitution and the Supreme Court expressly required, when he was savagely attacked by two convicted violent felon "caretakers" on August 12, 1993 and nearly murdered by one of them.

31. The gruesome, savage and bloody attack of committed mentally ill inpatient Jason Davis on August 12, 1993 – by his convicted violent felon "caretakers" – has been detailed in verdict forms, reported federal opinions, trial transcripts, reported appellate opinions and two recent letters to Governor Healey and Attorney General Andrea J. Campbell. Davis,

264 F. 3d, at 86-117; <u>Davis</u>, 997 F. Supp., at 137-140; <u>Davis</u>, 535 U.S. 1053 (2002); (1/1-3; 2/1-8; 3/1-23; Ex. 4-16; 11/1-6; 14/1-17; 15/1-16; 17/1-9; 18/1-16; 26/57-65, 1281-1284; 47/1-17; 43/1-2; 48/1-39; 49/1-5; 60/1-2; 61/1).

32.  On August 12, 1993 convicted violent felon "caretaker" Phillip Bragg literally tried to murder Jason in a locked ward at the Hospital. <u>Davis</u>, 264 F. 3d, at 94; (2/1-8; 3/1-23; Ex. 4-16; 11/1-6; 14/1-17; 15/1-16; 17/1-9; 18/1-16; 26/57-65, 1281-1284; 47/1-17).

33.  Phillip Bragg pummeled Jason Davis with an onslaught of punches, which produced a gruesome, gory and bloody scene, while five (5) other mental health care workers ("Mental Health Care Workers"), including convicted violent felon Paul Rennie, pinned Jason Davis to the floor of the ward to perpetuate this savage attack and while, yet still, a charge nurse ("Charge Nurse Joyce Weigers" or "Joyce Weigers") looked on and actually encouraged the attack (collectively "Davis Attackers"). <u>Davis</u>, 264 F. 3d, at 86, 91-96, 103-104,110-117, 86-117; (1/1-3; 2/1-8; 14/8-10, 1-17; 15/9, 1-16; 26/57-65, 1281-1284).

34.  Phillip Bragg then tried to snap Jason Davis' neck in two while he was still pinned to the floor by the Davis Attackers. <u>Id</u>., at 94; (2/1-8; 14/8-10, 1-17; 15/9, 1-16).

35.  The Davis Attackers consisted of Paul Rennie, Richard Gillis, Michael Hanlon, Leonard Fitzpatrick, Nicholas L. Tassone, Joyce Weigers and Phillip Bragg. <u>Id</u>., at 86-117; (1/1-3; 17/1-9).

36.  On August 2, 1996 Jason Davis filed a complaint ("First Davis Complaint") in this Court ("Davis Case" or "District Court Proceeding") which asserted, *inter alia*, a civil rights action though 42 U.S.C. §1983 for willfully and maliciously committed civil rights violations. <u>Id</u>., at 86-117; (1/1-3; 17/1-9; 18/1-16).

37.     The District Court civil action number in the Davis Case was 96-11598-MEL. (17/1-9).

38.     Through the District Court Proceeding Jason Davis sought damages for willfully and maliciously inflicted civil rights violations by the Davis Attackers who were non-constitutional officer public employees. Davis, 264 F. 3d, at 86-117; (1/1-3; 17/1-9; 18/1-16).

39.     The Davis Case trial exhibits, which are still part of the record in this court, the United States Court of Appeals for the First Circuit ("First Circuit") and the Supreme Court, proved the documented commission of the very worst types of crimes against mentally ill inpatients at the Hospital including Rape, Torture, Indecent Sexual Assault and Battery, Criminal Battery, Criminal Assault, Physical Violence, Physical Abuse, Neglect, Threats, Emotional Abuse, Intimidation, Swastika Branding and Verbal Abuse by staff. (19/1-22).

40.     More than one (1) year before the Davis attack occurred the District Attorney for Worcester County, Massachusetts forwarded a letter to the Chief Operating Officer at the Hospital indicating that the Hospital's Human Rights Committee had informed him that they were "concerned that incidents of criminal wrongdoing might be slipping through the cracks." (20/1).

41.     The Davis Case "slipped through the cracks."

42.     The Massachusetts Attorney General's Office represented all of the Davis Attackers, except for Phillip Bragg, in this court though it did not commence representing Charge Nurse Joyce Weigers until the Davis Case trial had concluded.

43.     The Federal District Court jury trial of the Davis Case commenced in this court on September 29, 1998 and concluded a month later on October 28, 1998. Id., at 96.

44. The Davis Case jury returned a verdict, in favor of Jason Davis, against the Davis Attackers on October 28, 1998. Id., at 91, 96; (1/1-3; 17/1-9).

45. The jury awarded compensatory and punitive damages against the Davis Attackers. Id., at 91, 96; (1/1-3; 17/1-9).

46. The third amended judgment ("Third Amended Judgment"), entered upon the Davis Case jury verdict, now stands at $2,574,901 ("2.57M") with a per diem of $139.40.  (1/1-3).

47. The Third Amended Judgment was never paid.

48. Two triers of fact in the District Court Proceeding consisting of a federal jury and Senior District Judge Morris E. Lasker, who had served on the federal bench for 30 years when the Davis Case trial began, determined that the damages awarded in the Davis Case were reasonable.

49. Senior District Judge Morris E. Lasker was appointed by President Johnson in 1968 upon the recommendation of Senator Robert F. Kennedy.

50. Senior District Judge Morris E. Lasker was a renowned civil rights jurist and a literal legal legend in the United District Court for the Southern District of New York (25 years) and this court (15 years). https://www.nytimes.com/2009/12/29/nyregion/29lasker.html

51. The Davis Case federal jury initially made their reasonableness determination through its verdict; verdicts long being held in our judicial system to be not only sacred but inherently reasonable as well.

52. Senior District Judge Morris E. Lasker, an acutely knowledgeable and experienced jurist, insured further "reasonableness" of the verdict damages by reducing them by $525,000 through a remittitur. Id., at 96.

53. Jason Davis did not oppose or appeal the entry of the remittitur.

54.     Jason Davis never appealed any issue or claim to any court after winning his one-month trial in this court.

55.     The Commonwealth of Massachusetts, through its Attorney General's Office, initiated the appeal to the First Circuit and then filed a Petition for a Writ Of Certiorari ("Certiorari Proceeding") in the Supreme Court.

56.     Jason Davis prevailed against the Commonwealth of Massachusetts, and its Attorneys General, in three federal courts consisting of this court, the First Circuit and the Supreme Court.

57.     The First Circuit docket number was 99-1453.

58.     The Supreme Court docket number was 01-1144.

59.     The First Circuit then held that there was a "reasonable relationship between the injury and the amount of the award." Id., at 116, 95.

60.     The judgment of this court in the Davis Case was affirmed, in its entirety, by the First Circuit in 2001. Id., at 117.

61.     The Davis Case was tried before a jury for one month, a jury verdict was rendered, a remittitur of $525,000 was entered by an erstwhile judge, three judgments were entered upon the jury verdict, two appeals were filed, three reported opinions were generated and the Commonwealth's Petition for a Writ of Certiorari was denied. (21/1-2).

62.     The Davis Case damages were deemed reasonable by a Federal District Court jury who had sat for one month, an erstwhile judge and a panel of three appellate judges at the First Circuit.

63.     Evidence introduced during the month-long federal trial in the Davis Case demonstrated that the two principal aggressors, Phillip Bragg and Paul Rennie, were convicted violent felons at hire which the DMH knew. (22/1-4; 23/1-2; 24/1-6).

64.     Both Phillip Bragg and Paul Rennie had been hired by the DMH at the Hospital to work in direct patient care capacities following their convictions and incarcerations for violent felonies.  Id., at 91-96; (22/1-4; 23/1-2; 24/1-6).

65.     Phillip Bragg had been indicted for assault with intent to murder and assault and battery with a dangerous weapon (gun) prior to commencing employment for the DMH at the Hospital in a direct patient care capacity. (22/1-4; 23/1-2).

66.     Phillip Bragg pled guilty to assault and battery with a dangerous weapon (gun) and was sentenced to 10 years of incarceration in a Massachusetts prison (one (1) year served) prior to commencing employment for the DMH at the Hospital. (22/1-4).

67.     Phillip Bragg's felony prison sentence resulted from his having shot a 16 year old boy in the eye with a gun at short range.

68.     Phillip Bragg was released from prison only a short time before he actually began employment for the DMH at the Hospital in a direct patient care capacity. (22/1-4; 23/1-2).

69.     Phillip Bragg had a history of employment related violence and abuse upon patients, prior to the incident involving Jason Davis on August 12, 1993, as numerous Davis Case trial exhibits proved.

70.     A former DMH Commissioner, Eileen P. Elias, testified at the trial in the Davis Case that Phillip Bragg should not have been employed as a Mental Health Care Worker in 1992, one (1) year before the Davis incident, given his violent tendencies. (25/1-2).

71.  Paul Rennie had been indicted for two counts of armed robbery and one count of assault and battery with a dangerous weapon prior to commencing employment for the DMH at the Hospital in a direct patient care capacity. (24/1-6).

72.  Paul Rennie sought to steal a car from one victim by striking him with a metal pipe and to rob money from yet another victim at gunpoint. (24/1-6).

73.  Paul Rennie plead guilty to these two counts of armed robbery and the one count of assault and battery with a dangerous weapon and was incarcerated in a Massachusetts prison for one (1) year prior to commencing employment for the DMH at the Hospital. (24/1-6).

74.  Phillip Bragg's and Paul Rennie's employment by the DMH at the Hospital constituted an extreme risk of harm to all mentally ill inpatients subject to their "care," including Jason Davis, given their convictions and incarcerations for violent felonies, violent employment histories and the national recidivism rate of 34.6% for convicted violent felons. See Recidivism of Prisoners Released in 1983 (Bureau of Justice Statistics Special Report – Department of Justice).

75.  That Phillip Bragg and Paul Rennie were the principal aggressors on August 12, 1993 came as a statistical surprise to nobody given their work histories, convictions, incarcerations for violent felonies and the recidivism rate amongst convicted violent felons.

76.  Through its landmark Federal Civil Rights opinion the First Circuit recounted the brutalization of Jason Davis via the trial testimony of State Police Officer Greg Plesh, Jason Davis and Davis Case Defendant Nicholas Tassone:

   [State Police Officer Greg Plesh] recounted: 'Jason is lying down in the

hallway, head is away from me, feet are towards me. Staff is encircling him. And it's not what I saw, it's what I felt. I initially felt the thud through the [concrete slab] floor and then heard a thud.' Plesh said he looked up and saw Bragg punch Davis in the head four to five times. Plesh continued: I turned to [Charge Nurse] Joyce Wiegers who was on my right shoulder. When I saw Jason Davis being punched, I said, 'Did you see that? Are you going to do anything about this? Are you going to allow this to happen?' She didn't say anything, and I really wasn't waiting at that point. Some more was occurring and at that point I decided to intervene. As the MHWs began rolling the patient onto his stomach, Bragg twisted Davis's neck to the side and Plesh climbed over the other MHWs to push Bragg away. Davis testified about the punching: 'It was over and over and over and over again. It was like it would never stop. And then I was calling for help and nobody was stopping them and they kept hitting me. I felt the blood; it was, you know, it was coming down my face.' Plesh said that Davis's 'eyes were rolling out of his head,' that '[t]here was swelling, bruising all in his face,' and that he checked to make sure that Davis's neck had not been broken. [Defendant] Tassone said that Davis's face was cut and bloody.

<u>Davis</u>, 264 F. 3d, at 94. (brackets supplied).

77.   State Police Officer Greg Plesh prepared a Police Report which reads as follows:

As many as eight staff members were on top of Jason. Phillip Bragg was up by Jason's head. I observed him punch Jason Davis five or six times with extremely hard blows. I could hear every impact and instantly the patient started to bleed and swell in the area of the eyes, forehead and temple area. I moved in to stop Phillip Bragg but before I could get there he used a head twisting technique that I did have to stop. Extreme force was used, Jason's neck was being twisted to its limit. **Phillip put a knee on Jason's head and with both hands was forcing Jason's head down into the floor.** I moved Phillip off Jason's head and checked to make sure it had not been broken. Jason calmed down as soon as his head was released. While Phillip was holding Jason's head down this officer observed him say to Jason, this is what you wanted this is what you got. (2/2-3) (emphasis supplied).

78.   State Police Officer Greg Plesh testified as follows:

The head twisting technique was so severe I went around the pile of people, around Phillip Bragg, and pushed Phillip Bragg off Jason Davis' head with my shoulder and then instantly went to his Jason's neck. **And at that point, I noticed that his eyes were rolling out of his head.  You could see the whites of his eyes**. The eyes were up to the top. He was in a what I would call a semiconscious state. There was some bleeding on the floor. There was swelling, bruising all in his face noticeable at that time... (15/9) (emphasis

supplied).

79.   Within but a few more minutes Jason Davis would have been murdered had hero State Police Officer Greg Plesh not intervened at the scene and stopped the bloody carnage. (14/1-17; 15/1-16; 2/1-8).

80.   The blows to Jason Davis' head were so violent and extreme in force that State Police Officer Greg Plesh felt them through his feet while upon the concrete slab floor in the ward. (15/5-6).

81.   These "thuds" are precisely what alerted him to the violent attack in the first place. (15/5-6).

82.   Convicted violent felon Paul Rennie brutalized Jason Davis on August 12, 1993 in a separate incident. Id., at 93, 110-112; 86-117.

83.   Davis Case Defendant, Nicholas L. Tassone, testified that Jason Davis looked like "a fighter looks after they get out of the ring, how sometimes they get cut on their eye, and they have blood dripping down their face." (26/61-62).

84.   Nicholas Tassone observed a "puddle" of Jason Davis' blood on the floor after the attack and indicated that he was "bleeding profusely". (26/60).

85.   Nicholas Tassone testified that he had his tires slashed and windshield broken when he reported physical abuse by staff on patients prior to August 12, 1993. (26/57).

86.   Nicholas Tassone testified that he initially failed to report the physical abuse by Phillip Bragg upon Jason Davis because he was afraid of physical retaliation by Bragg. (26/57, 1281-1284)

87.   When DMH staff barbarically placed Jason Davis face down on the Four Point Mechanical Restraint Table, after his savage beating, he could not breathe. (14/11-17).

88.  Jason Davis kept moving the physical position of his face in an attempt to stop drinking the blood that was pouring out of his nose and mouth and into his throat. (14/11-17).

89.  DMH staff finally unstrapped him from the Four Point Mechanical Restraint Table after about an hour at the behest of Civil Rights Officer Kermit Brown. (14/11-17).

90.  Jason Davis was then allowed to go to the bathroom where he vomited up blood. (14/11-17).

91.  The sheet from the Four Point Mechanical Restraint Table was soaked with blood and there was a puddle of blood on the mattress under it. (14/11-17).

92.  In the minutes after the attack dried blood was scabbed like eyeliner in, under and around Jason Davis' eyes and he was bleeding profusely from his gumline, face and mouth. (14/11-17; 2/1-8).

93.  Next following the attack Charge Nurse Joyce Weigers told Jason Davis that "[t]his is what you get when you act – this is what you get when you act like this." Id., at 94-95.

94.  After the attack Jason Davis was placed in locked room overnight by staff and ordered not to talk about the attacks when he left that room:

> They locked – they put me into a locked room and they wouldn't let me out of the room and they said I couldn't talk to anybody. They said not to talk to anybody about it (the attacks). And I was begging them to let me out of the room because I want to, you know, smoke and stuff. And they said as long as you don't talk about it. And I walked out and saw Dean [    ]. And told - I asked Dean [    ] about it and stuff, and we started to talk about it (the attacks). This guy, I can't remember the guy's name, he said: You weren't supposed to talk about it.  (14/15).  (parentheses supplied; patient's last name deleted).

95.  The First Circuit recounted the acute psychiatric injuries sustained by Jason Davis, as per his treating psychiatrist, within its reported opinion:

> Davis presented additional medical evidence at trial from Dr. R. Amos Zeidman, his treating psychiatrist for periods beginning in 1991.  In late 1996

14

or early 1997, Dr. Zeidman diagnosed Davis with Post Traumatic Stress Disorder (PTSD) as a result of the physical restraint at Westborough. He said that Davis 'was horrified' by the event because **'[h]e thought he was going to die.'** Dr. Zeidman said that Davis's PTSD symptoms included insomnia, anxiety, panic states, flashbacks, nightmares, and an inability to concentrate. He said that Davis was having difficulty making progress in therapy because he was afraid to trust anyone and that '[t]he quality of his life has suffered terribly for this.' Here, the evidence supports a finding of significant actual and potential harm. According to Dr. Zeidman, the psychological harm Davis has suffered from the incident has seriously affected his quality of life, causing a range of PTSD symptoms, demonstrating the reasonable relationship between the injury and the amount of the award. (emphasis supplied)

Id., at 95, 117 (emphasis supplied).

96.   Following the attack a cover up by some of the Davis Attackers ensued which included false allegations of impropriety against hero State Police Officer Greg Plesh and the falsification of medical records by Charge Nurse Joyce Weigers. Id., at 95, 115-116; (51/1-2).

97.   The Davis judgment (Third Amended Judgment) was renewed in 2010. (1/1-3).

98.   The jury found that the Davis Attackers were liable for willful and malicious civil rights violations based upon excessive force, unreasonable bodily restraints and their failure to intervene. Id., at 86 – 117; (1/1-3; 17/1-9; 18/1-16).

99.   Each of these substantive claims were based upon the Due Process Clause as asserted through 42 U.S.C. §1983. Id., at 86-117; (1/1-3; 17/1-19; 18/1-16).

100.   The First Circuit held that "[t]here was sufficient evidence to support the jury's finding that the [Davis Attackers] acted with 'evil motive' toward Davis." (brackets supplied). Davis, 264 F. 3d, at 115-116.

101. **The Davis Case is one of the most vile, grotesque and obscene injustices in the history of the Commonwealth of Massachusetts.** (2/1-8; 14/1-17; 15/1-16); <u>Davis</u>, 264 F. 3d, at 86-117.

102. None of the Davis Attackers were Massachusetts constitutional, police or municipal officers. <u>Id</u>., at 86-117.

103. The text of M.G.L. c. 258, §9 ("Indemnification Statute" or "M.G.L. c. 258, §9") reads as follows:

> ### Section 9: Indemnity of Public Employees
>
> Section 9. Public employers may indemnify public employees, and the commonwealth shall indemnify persons holding office under the constitution, from personal financial loss, all damages and expenses, including legal fees and costs, if any, in an amount not to exceed $1,000,000 arising out of any claim, action, award, **compromise, settlement** or judgment **by reason of an intentional tort,** or by reason of any act or omission which constitutes a violation of the civil rights of any person under any federal or state law, if such employee or official or holder of office under the constitution at the time of such intentional tort or such act or omission was acting within the scope of his official duties or employment. **No such employee or official, other than a person holding office under the constitution** acting within the scope of his official duties or employment, **shall be indemnified under this section for violation of any such civil rights if he acted in a grossly negligent, willful or malicious manner.** For purposes of this section, persons employed by a joint health district, regional health district or regional board of health, as defined by sections twenty-seven A and twenty-seven B of chapter one hundred and eleven, shall be considered employees of the city or town in which said incident, claim, suit, or judgment is brought pursuant to the provisions of this chapter. (emphasis supplied).

104. Indemnification is foreclosed under the Indemnfication Statute if civil rights violations are committed by public employees, who are not Constitutional Officers, in a grossly negligent, willful or malicious manner.  <u>Id</u>.; (17/1-9; 1/1-3; 18/1-16).

105. There is no requirement, on the face of the Indemnfication Statute or in its interpretive caselaw, that a judicial finding must be made before actions will be construed to be

grossly negligent, willful or malicious in nature and thus outside the ambit of indemnification under the Indemnification Statute. Id.

106. The plain text of the Indemnification Statute provides that even "compromises" and "settlements" – which necessarily can only occur in the absence of a "judicial finding" – may be effected under the Indemnification Statute as long as the non-constitutional officer employee does not act in a "grossly negligent, willful or malicious manner" as determined by the indemnifier at the time of indemnification.

107. Sister provisions of the Indemnification Statute, as set forth in M.G.L. 258, §§9, 9A and §13, do concededly permit constitutional, police and municipal officer indemnification for willful civil rights violations but these subsections or sections are inapplicable here since no such public employee culprit – in any of the relevant cases referenced in this Complaint – was a constitutional, police or municipal officer.

108. The Plaintiff concedes that indemnification under the Indemnification Statute was not legally permissible, in the context of the Davis Case, because: (i) the public employees at issue were not Constitutional Officers; and (ii) the civil rights violations were committed willfully and maliciously.  (1/1-3; 2/1-8; 14/1-17; 15/1-16; 17/1-9; 18/1-16); Davis, 264 F. 3d, at 86-117; M.G.L. c. 258, §9.

109. The Massachusetts Executive Branch has twice informed the Plaintiff that indemnification of the Davis Case under the Indemnification Statute was not legally permissible. (30/1; 31/1-2).

110. The Plaintiff has always agreed with this legal conclusion.

111. The Soldiers' Home in Holyoke, Massachusetts ("Soldiers' Home") is a long-term healthcare care facility, located in Holyoke Massachusetts, which is operated by the

Commonwealth of Massachusetts pursuant to M.G.L. c. 6 §§70, 71; M.G.L. c. 17, §17; M.G.L. c. 115A, §12, M.G.L. c. 111, §71; 105 C.M.R. §105.001 and 38 C.F.R. §51.2 amongst other authorities.

112. The mission of the Soldiers' Home is "Care with Honor and Dignity" insofar as its residents are military veterans all of whom are heroes.

113. The Superintendent and Board of Trustees of the Soldiers' Home serve under and are supervised by the Governor of Massachusetts.

114. The Soldiers' Home is required to render medical care to its veteran patients which complies with applicable standards of medical care governing the types of care rendered.

115. The care is expected to be no less than adequate in any particular medical discipline.

116. No less than 164 soldiers at the Soldiers' Home died or suffered injuries as a result of the acute mismanagement of the Covid-19 virus outbreak there during the course of the pandemic ("Holyoke Victims"). (32/4, 1-7; 34/1-78; 33/1-40).

117. At least 76 soldiers at the Soldiers' Home died as result of said Covid-19 outbreak.

118. On July 17, 2020 a class action ("Class Action") lawsuit was instituted, in this court, which bears the Civil Action Number of 20-CV-30115. (33/1-40).

119. The Class Action amended complaint ("Class Action Amended Complaint") is 40 pages in length and sought compensation for the deaths and injuries sustained by the Holyoke Victims due to the acute mismanagement of the Covid-19 outbreak at the Soldiers' Home. (33/1-40).

120. On page two (2) of the Class Action Amended Complaint it states that "[t]his is a civil rights class action, brought pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 by the Estate of Joseph Sniadach ("Sniadach Estate"), a veteran who died as a result of a

COVID-19 outbreak at the Soldiers' Home." (33/2; parenthesis in original).

121.  The Class Action Amended Complaint is based entirely upon the Federal Civil Rights Act (42 U.S.C. §1983). (33/1-40).

122.  The Class Action Amended Complaint asserts only federal civil rights claims. (33/1-40).

123.  The Class Action Amended Complaint asserts no negligence claims. (33/1-40).

124.  The Class Action Amended Complaint asserts no gross negligence claims. (33/1-40).

125.  The Class Action Amended Complaint asserts no state law claims. (33/1-40).

126.  On page twenty-eight (28) of the Class Action Amended Complaint it states that "[t]he defendants' acts and omissions were done with deliberate indifference, and constituted deliberate disregard for the health, safety, and federal rights of the veterans of the Soldiers' Home." (33/37).

127.  Bennett Walsh was the Superintendent for the Soldiers' Home at all times material herein. (33/1-40).

128.  David Clinton was Medical Director for the Soldiers' Home at all times material herein. (33/1-40).

129.  Bennet Walsh and David Clinton were named as defendants in the Class Action Amended Complaint. (33/1-40).

130.  Bennett Walsh, as Superintendent, and David Clinton, as Medical Director, had pivotal and substantial obligations for the safety of the soldiers as the Soldiers' Home, during the course of the pandemic, given their respective roles and applicable law. (33/1-40).

131.  An unapproved Class Action settlement agreement proposal ("Class Action Settlement Agreement") was executed by Massachusetts Governor Charles Baker and filed by him on May 20, 2022 a portion of which reads as follows: "This Class Settlement Agreement

is made by and between Class Representatives, individually and on behalf of the Settlement Class, Defendants and the Governor's Office [Charlie Baker] for the Commonwealth of Massachusetts on behalf of the Commonwealth of Massachusetts." ("Governor's Office"); (34/1, 7, 45; brackets supplied).

132.   The Class Action Settlement Agreement was not approved by this court until it endorsed its class action approval order ("Class Action Approval Order") on November 14, 2022. (32/1-7).

133.   In its Class Action Approval Order this court held that it was approving the Class Action Settlement Agreement, as filed on May 20, 2022, between the "Plaintiffs, the Defendants, and the Commonwealth of Massachusetts' Governor's Office…" (34/1, 6-7).

134.   Upon approval on November 14, 2022 the Class Action Settlement Agreement exclusively compensated the Holyoke Victims for the deliberately indifferent Federal Civil Rights Act claims asserted in the Class Action Amended Complaint insofar as no negligence claims had been asserted. (33/37, 1-40).

135.   The Class Action Approval Order included a provision which awarded the Holyoke Victims the sum of $57,912,500 as remitted by the Governor's Office "to resolve this case." (34/1, 6-7).

136.   The Governor's Office funded the entirety of the $57,912,500 called for in the Class Action Settlement Agreement and Class Action Approval Order including $11,512,500 in attorneys' fees. (34/1, 7, 45, 1-78; 32/6, 1-7).

137.   The Governor's Office took **179 days** (5/20/22 – 11/14/22) to secure $57,912,500 for the 164 Holyoke Victims to fulfill Governor Baker's obligations under the Class Action

Settlement Agreement. (34/1-78; 32/1-7).

138.   Prior to the November 14, 2022 settlement date in the Class Action the Defendant, then
       the Attorney General for the Commonwealth of Massachusetts, indicted, through the use
       of a Statewide Grand Jury convened by her, Bennet Walsh and David Clinton for their
       criminal conduct attendant to their actions and omissions at the Soldiers' Home. (32/1-7;
       34/1-78; 35/1-20).

139.   Twenty true bills of indictment ("Twenty Holyoke Indictments") were returned on
       September 24, 2022 by the Statewide Grand Jury which was some seven (7) weeks
       before the Class Action Settlement Agreement was approved by this court.  (11.14.22).
       (35/1-20; 32/1-7; 33/1-40; 34/1-78). (Indictment Nos. 20-0177 (1-10); 20 0178 (1-10)).

140.   These criminal charges consist of M.G.L. c. 265, §13k(e) (Caretaker Who Wantonly or
       Recklessly Commits or Permits Bodily Injury to an Elder or Disabled Person) and
       M.G.L. c. 265, §13k (d ½) (Caretaker Who Wantonly or Recklessly Commits or Permits
       Abuse, Neglect or Mistreatment to an Elder or a Disabled Person).  (35/1-20).

141.   Bennet Walsh and David Clinton were each charged with five (5) counts of M.G.L. c.
       265, §13k(e) for a total of ten counts. (35/1-20).

142.   Bennet Walsh and David Clinton were each charged with five (5) counts M.G.L. c.  265,
       §13K (d ½) for a total of ten counts. (35/1-20).

143.   Bennet Walsh and David Clinton ("Criminal Defendants") were collectively charged
       with ten (10) violations of each statute both such statutes requiring "wanton or reckless"
       conduct. (35/1-20); Ibid.; Id.

144.    Bennet Walsh and David Clinton were therefore not only named as civil Defendants in
        the Class Action Amended Complaint but were also named as Criminal Defendants in a

State court criminal prosecution ("Holyoke Criminal Prosecution") for their actions and omissions at the Soldiers' Home in the context of their acute mismanagement of the Covid-19 outbreak there.  (32/1-7; 33/1-40; 34/1-78; 35/1-20).

145.    The Criminal Defendants filed motions to dismiss the Twenty Holyoke Indictments in the Hampden Division of the Superior Court Department of the Trial Court for the Commonwealth of Massachusetts ("Holyoke Motions to Dismiss") which motions were allowed.  (McDonough., J.). (36/1, 2-54).

146.    The Supreme Judicial Court for the Commonwealth of Massachusetts ("Supreme Judicial Court") granted an application for direct appellate review as filed by the Defendant in her then capacity as Attorney General for the Commonwealth of Massachusetts. (36/17).

147.    The Holyoke Motions to Dismiss addressed the alleged insufficiency of the evidence in terms of its rising to the level of being "wanton or reckless" under the law as called for in the Twenty Holyoke Indictments. See M.G.L. c. 265, §13K (e); M.G.L. c. 265, §13K (d ½); (35/1-20; 36/1-40).

148.    The return of the Twenty Holyoke Indictments by the Statewide Grand Jury constituted a "belie[f]" by this Grand Jury, by virtue of "'definite and substantial'" evidence, that "offense[s] ha[d] been committed. . ." Commonwealth v. Javon, 403 Mass. 808, 817 (2012) (brackets supplied).

149.    The return of the Twenty Holyoke Indictments by the Statewide Grand Jury constituted a "belie[f]" by this Grand Jury that the Criminal Defendants had acted willfully, wantonly, recklessly and intentionally in regard to the safety of the Holyoke Victims. Id. (brackets supplied).

150.   The Statewide Grand Jury made a judicial finding that the Criminal Defendants acted

willfully, wantonly, recklessly and intentionally. (35/1-20; 36/1-40).

151.   On April 27, 2023 the full Supreme Judicial Court (5-2) ruled, on detailed and robust

evidentiary proffers put forth by the Defendant, who was then the Attorney General, and

the Defendants in the State Court Criminal Prosecution, that:

> "Last, the Commonwealth presented sufficient evidence to support probable
> cause that, in consolidating the floors, the defendants did so 'wantonly' or
> recklessly' G.L. c. 265, §13K (d½). 'Wanton or reckless conduct is
> 'intentional conduct, by way either of commission or of omission where
> there is a duty to act, which conduct involves a high degree of likelihood
> that substantial harm will result to another.' Commonwealth v. Earle, 458
> Mass. 341, 347 (2010), quoting Commonwealth v. Welansky, 316 Mass.
> 383, 399 (1944). 'Wanton or reckless conduct amounts to what has been
> variously described as indifference to or disregard of probable
> consequences.' Commonwealth v. Godin, 374 Mass. 120, 129 (1977), cert.
> denied, 436 U.S. 917 (1978), quoting Welansky, supra."

> Commonwealth v. Clinton, Docket No. SJC – 13335, p. 35-36 (Slip. Op.
> 4.27.23). (36/35-36).

152.   A majority of the Supreme Judicial Court (5-2) made a judicial finding that the Criminal

Defendants acted willfully, wantonly, recklessly and intentionally. (36/35-36).

153.   The Supreme Judicial Court ruling necessarily relates back to the state of the evidence

before and as of the date when the Twenty Holyoke Indictments were returned by the

Statewide Grand Jury (9.24.22). (35/1-20; 36/1-40).

154.   Prior to and ever since the date on which the Defendant indicted the Criminal

Defendants (9.24.22) she has been of the legal opinion that they acted willfully,

wantonly, recklessly and intentionally in the context of their acute mismanagement of

the Covid-19 pandemic at the Soldiers' Home. (35/1-20; 36/1-40).

155.   The Defendant, in her prior capacity as Attorney General, informed the Superior Court

Department of the Trial Court for the Commonwealth of Massachusetts and the Supreme Judicial Court in the <u>Clinton</u> case that the Criminal Defendants acted willfully, wantonly, recklessly and intentionally in the context of their acute mismanagement of the Covid-19 pandemic at the Soldiers' Home. (35/1-20; 36/1-40; 63/1-3).

156.   From the time that Attorney General Andrea J. Campbell was sworn in, on January 18, 2023, she also: (i) represented the Commonwealth in <u>Commonwealth v. Clinton</u>; and (ii) has been of the legal opinion that said Criminal Defendants acted willfully, wantonly, recklessly and intentionally in the context of their acute mismanagement of the Covid-19 pandemic at the Soldiers' Home. (35/1-20; 36/1-40).

157.   Since the <u>Clinton</u> court held that **"wanton or reckless conduct is intentional conduct…"** indemnification, under the Indemnfication Statute, is legally foreclosed for a rather simplistic reason. <u>Clinton</u>, at p. 35-36 (emphasis supplied).

158.   "[I]ntentional conduct cannot be negligent conduct and negligent conduct cannot be intentional conduct." <u>Waters v. Blackshear</u>, 412 Mass, 589, 590 (1992).

159.   A "finding of intentional conduct precludes a finding that this same conduct was negligent." <u>Sabatinelli v. Butler</u>, 363 Mass, 565, 567 (1973).

160.   Intentional conduct is always "willful" conduct.

161.   The <u>Clinton</u> ruling precludes indemnification of the Criminal Defendants' Class Action civil claims, under the Indemnfication Statute, for the simple reason that their conduct was not negligent as a matter of law – it was intentional - and only negligent conduct is indemnifiable in this context. <u>See</u> M.G.L. c. 258, §9.

162.   Indemnification is barred under the Indemnfication Statute when the civil rights violations are committed by non-constitutional officer public employees in a grossly

24

negligent, willful or malicious manner. <u>See</u> M.G.L. c. 258, §9.

163.   Since willful, wanton, reckless and intentional conduct are terms which have been equated under Massachusetts law, in both <u>Clinton</u> and <u>Forbush v. City of Lynn</u>, 35 Mass. App. Ct. 696 & n. 6 (1994), neither Bennett Walsh nor David Clinton was entitled to have his federal civil rights claims indemnified under the Indemnfication Statute since they both acted *"willfully"* in violation of the Indemnfication Statute.

164.   The Criminal Defendants, Bennett Walsh and David Clinton, both acted willfully, wantonly, recklessly and intentionally as judicially found by the Supreme Judicial Court and a Statewide Grand Jury.

165.   Anything past mere "negligence," the lowest rung on the civil culpability ladder, is not indemnifiable under the Indemnification Statute in this context.

166.   None of the Class Action defendants were constitutional, police or municipal officers.

167.   Though the Indemnfication Statute does not even require a "judicial finding," to determine whether statutory indemnification is barred because the subject conduct was grossly negligent, willful or malicious in nature, two such "judicial findings" were made in the context of the Holyoke Criminal Prosecution.

168.   On or about December 20, 2019 a lawsuit was instituted, in the Middlesex Division of the Superior Court Department of the Trial Court for the Commonwealth of Massachusetts, by four foster children ("Blouin Case Victims") against Susan Blouin, Raymond T. Blouin, Phillip A. Paquette and 17 former employees of the Massachusetts Department of Children and Families ("DCF"). ("Blouin Case").

169.   The Blouin Case bears the Civil Action Number of 1981-CV-03788.

170.   The Third Amended Complaint filed in the Blouin Case is 99 pages in length and sought

damages, on behalf of Blouin Case Victims, as a result of said victims having been serially raped, digitally raped, orally raped, indecently assaulted, sexually abused, sexually assaulted, humiliated, degraded, physically abused, emotionally abused and tortured at the hands of Susan Blouin, Raymond T. Blouin, Phillip A. Paquette and through the inaction of 17 DCF employees.

171. Susan Blouin, Raymond T. Blouin and Phillip Paquette were the alleged "Foster Parents."

172. The Third Amended Complaint asserts a variety of Federal Civil Rights claims and details conduct which not only included that set forth above but various forms of torture as well including: (i) compelling the foster children to engage in acts of bestiality; (ii) whipping the foster children with belts and dog leashes; (iii) locking the foster children in dog cages; and (iv) compelling the foster children to drink their own urine, eat their own feces and otherwise succumb to a wide variety of sexually and physically torturous activities (collectively "torture").

173. At least two of the Defendants in the Blouin Case, Raymond T. Blouin and Phillip A. Paquette, have also been charged criminally.

174. On August 7, 2019 Raymond T. Blouin was charged with one count of indecent assault and battery upon a child under the age of 14 in violation of M.G.L. c. 265, §13B which matter still pends (after 4 years) in the Dudley Division of the District Court Department of the Trial Court for the Commonwealth of Massachusetts (Docket No. 1964-CR-002638).

175. On December 2, 2019 Phillip A. Paquette was charged with and later indicted on two counts of rape ("Two Blouin Indictments") of a child in violation of M.G.L. c. 265, §23 which matter still pends (after 4 years) in the Worcester Division of the Superior Court

Department of the Trial Court for the Commonwealth of Massachusetts (Docket No. 2185-CR-00182). (64/1-3).

176. The return of the Two Blouin Indictments by the Worcester County Grand Jury constituted a "belie[f]" by this Grand Jury, by virtue of "'definite and substantial'" evidence, that "an offense ha[d] been committed. . ." <u>Javon</u>, 403 Mass., at 817 (brackets supplied). (64/1-3).

177. The return of the Two Blouin Indictments by the Worcester County Grand Jury constituted a "belie[f]" by this Grand Jury that Phillip A. Paquette willfully raped a child two times. <u>Id</u>.; (brackets supplied). (64/1-3).

178. The Worcester County Grand Jury made a judicial finding that Phillip A. Paquette willfully raped a child two times. (64/1-3).

179. The DCF ignored 14 written complaints of abuse, while the Blouin Case Victims were housed at the Blouin home, which caused the systematic perpetuation of the above referenced criminal acts and torture at the hands of Susan Blouin, Raymond T. Blouin, Phillip A. Paquette and the inaction of 17 DCF employees.

180. None of the Blouin Case defendants were constitutional, police or municipal officers.

181. On or about August 11, 2023 the Massachusetts Executive Branch, through the Defendant and Attorney General Andrea J. Campbell, agreed to settle the Blouin Case for a reported $7,000,000 ("Blouin Case Settlement") with funds provided by the Commonwealth of Massachusetts.

182. Since the indemnified conduct in the Blouin Case included serial acts of rape, digitally rape, oral rape, indecent assault, sexual abuse, sexual assault, physical abuse, emotional abuse, torture and bestiality it is legally impossible to contend that this conduct was

"negligently" inflicted and thus indemnifiable under the Indemnfication Statute.

183. The referenced criminal acts are never "negligently" inflicted under Massachusetts law.

184. The Blouin Settlement was not, and could not have been, indemnified under the Indemnification Statute since the conduct at issue was, at the very least, willful and malicious.

185. The Blouin Settlement was not, and could not have been, indemnified under the Indemnification Statute since the conduct at issue was not mere "negligence."

186. Though the Indemnfication Statute does not even require a judicial finding, to determine whether statutory indemnification is barred because the subject conduct is grossly negligent, willful or malicious in nature, such a judicial finding was made in the context of the Blouin Case by a Worcester County Grand Jury through its return of the Two Blouin Indictments.

187. On January 20, 2023 the Plaintiff forwarded the Defendant a twenty-three (23) page constitutional demand letter ("Constitutional Demand Letter") with twelve (12) exhibits. (3/1-23; Ex. 4-16).

188. The Constitutional Demand Letter was served, via federal Express Priority No. 8165 9592 3695, on January 23, 2023 which was some **232** days ago. (16/1-6).

189. The Constitutional Demand Letter was served, via a Massachusetts Constable, on January 24, 2023. (16/7-9).

190. The Constitutional Demand Letter was served, via Certified Mail Return Receipt Requested No. 7019 1640 0002 3264 3484, on January 27, 2023. (16/10-16).

191. The Constitutional Demand Letter set forth, with exactitude, the legal and factual grounds in support of the proposition that the Class Action Settlement Agreement effectuated

disparate treatment, as between the Davis Estate and Holyoke Victims, which proximately

caused: (i) the Davis Estate's Due Process and Equal Protection Clause ("Equal Protection

Clause") rights under the Fourteenth Amendment to the United States Constitution to be

violated; and (ii) Plaintiff to sustain injury, injury in fact and damages including, to wit,

its failure to receive indemnification under the Executive Branch Custom in the amount of

2.57M. (3/1-23; Ex. 4-16); See infra.

192.    The Constitutional Demand Letter demanded the payment of the entire Third Amended

Judgment in the Davis Case, with interest at the rate of $139.40 per diem, which sum was

$2,542,282 as of the date when Constitutional Demand Letter was forwarded. (3/1, 23).

193.    The opening sentences of the Constitutional Demand Letter read as follows:

> This Demand Letter is a war cry from the bowels of our Democracy on
> behalf of Jason Davis. On May 13, 2014 you responded to my May 10,
> 2014 email as follows: **Thanks for sending these materials along. I'm
> reviewing now. It's a very sad situation. It was nice meeting you in
> Holliston. Did anything happen with the legislation this week?** (3/1;
> 4/1-2). (emphasis supplied). You were serving as an Assistant Attorney
> General, in charge of the Civil Rights Division, when I emailed you in
> 2014. Your email was responsive to a detailed email from the Davis
> family which outlined the sordid circumstances of the Jason Davis case
> and asked you to stand with the Davis family, in the public domain, to
> support its then pending legislation. (3/1; 4/1-2). This case is manifestly
> one of the most grotesque, vile and obscene injustices in the history of the
> Commonwealth of Massachusetts. A 'very sad situation,' as you called the
> Jason Davis Federal Civil Rights case in 2014, is in dire need of long
> sought after justice. (3/1; 4/1-2). **(emphasis in original).**

194.    The Constitutional Demand Letter demanded the above payment and the granting of other

affirmative relief within thirty (30) days next following January 20, 2023 which date was

February 19, 2023. (3/2, 22-23; 16/1-16).

195.    The Defendant failed to respond to the Constitutional Demand Letter which failure

effectuated an express denial of the relief sought in said demand.

196.    None of the Plaintiff's injuries or injuries in fact complained of here were sustained by it, under U.S. Const, art. III, §2, cl. 1 or any other part of said Constitution or any other law, prior to November 14, 2022.

197.    None of the Plaintiff's legal claims, as asserted herein, accrued prior to November 14, 2022.

### COUNT I - 42 U.S.C. § 1983

**DUE PROCESS AND EQUAL PROTECTION CLAUSES**
**FOURTEENTH AMENDMENT**
**UNITED STATES CONSTITUTION**

### [WILLIAM H. DAVIS, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JASON H. DAVIS, PLAINTIFF v. MAURA T. HEALEY, DEFENDANT]

198.    The Plaintiff incorporates herein by reference all paragraphs hereinbefore and hereinafter set forth as if specifically set forth herein.

199.    At all times material herein the Defendant was a State actor.

200.    At all times material herein the Defendant was clothed with the authority of State law.

201.    At all times material herein the Defendant engaged in State action.

202.    At all times material herein the Defendant acted under color of State law.

203.    At all times material herein the Defendant was a Constitutional Officer and a State employee.

204.    At all times material herein the Defendant was a Constitutional Officer acting for and in behalf of the Executive Branch for the Commonwealth of Massachusetts as its Governor.

205.    All claims asserted herein by the Plaintiff against the Defendant have been asserted against her in her individual or personal capacity for conduct, actions, inactions and

omissions engaged in by her, under color of State law, while acting as the duly elected Governor for the Commonwealth of Massachusetts.

206.   At all times material herein the Plaintiff was a "person" under 42 U.S.C. § 1983, the Due Process Clause and the Equal Protection Clause.

207.   At all times material herein the Defendant was a "person" under 42 U.S.C. § 1983, the Due Process Clause and the Equal Protection Clause.

208.   The Indemnification Statute bars any public employee indemnification for civil rights violations, committed by non-constitutional public employees, if they act in a grossly negligent, willful or malicious manner.

209.   The $57,912,500 payment made to the Holyoke Victims by the Massachusetts Executive Branch, acting by and through Governor Charlie Baker, could not have been made under the Indemnification Statute or any other section of M.G.L. c. 258, as it pertained to principal culprits Bennet Walsh and David Clinton, because each of them acted willfully, wantonly, recklessly and intentionally.

210.   Both a Statewide Grand Jury and a majority of the Supreme Judicial Court in Clinton judicially found that Bennet Walsh and David Clinton acted willfully, wantonly, recklessly and intentionally, in the context of their acute mismanagement of the Covid-19 outbreak at the Soldiers' Home, on or prior to September 24, 2022 which date was some seven (7) weeks before the Class Action Approval Order was approved by this court. (11.14.22) (32/1-7; 35/1-20; 36/1-40).

211.   The Massachusetts Executive Branch, acting by and through Governor Charlie Baker, contractually obligated the Commonwealth of Massachusetts to pay the $57,912,500 settlement to the Holyoke Victims, from State funds, even though such payment was

barred by the facial dictate of the Indemnification Statute. (32/1-7; 33/1-40; 34/1-78).

212.  The Massachusetts Executive Branch, acting by and through Governor Charlie Baker, had the legal ability to contractually obligate the Commonwealth of Massachusetts to pay the $57,912,500 Class Action Settlement to the Holyoke Victims, from State funds, due to his inherent power under the Executive Branch, as Governor, under State law and pursuant to a State custom.

213.  The ability of Governor Baker, in his capacity as the Governor and Chief Executive Officer of the Massachusetts Executive Branch, to contractually obligate the Commonwealth of Massachusetts to pay the $57,912,500 Class Action Settlement from State funds to the Holyoke Victims, relative to claims not subject to indemnification under Indemnification Statute, constitutes an Executive Branch custom ("Executive Branch Custom") which it has employed since no later than 2002.

214.  The Executive Branch Custom is a "custom" under the plain text of 42 U.S.C. §1983.

215.  Former Massachusetts Governor Baker perpetuated, was the driving force behind and orchestrated the $57,912,500 Class Action settlement and payment. (32/1-7; 34/1-78).

216.  The Governor's Office was a signatory to the Class Action Settlement Agreement which was approved by this Court. (32/1-7; 34/1-78).

217.  The Governor's Office secured all the funds for the Class Action Settlement. (32/1-7; 34/1-78).

218.  From 2002 to present date Executive Branch Officials have made payments pursuant to the Executive Branch Custom which were otherwise barred under the Indemnification Statute.

219.  The Massachusetts Executive Branch actually employed the Executive Branch Custom in

2002 to make a partial payment of $177,759.82 to Jason Davis, on behalf of public employee Nicholas Tassone, after a jury verdict was returned (1998) and judgment entered upon it in the Davis Case (1999). (1/1-3; 17/1-19; 18/1-16; 37/1).

220. This payment was barred by the Indemnification Statute because the civil rights violations at issue were committed willfully, as found by a jury sitting in this court, and because none of the Davis Attackers were constitutional, police or municipal officers.

221. The jury found that the Davis Attackers, including Nicholas Tassone and separate and apart from any punitive damage claim, were liable for willful civil rights violations based upon excessive force, unreasonable bodily restraints and the failure to intervene. Davis, 264 F. 3d, at 86 – 117; (1/1-3; 2/1-8; 14/1-17; 15/1-16; 17/1-9; 18/1-16; 50/1-11).

222. The Massachusetts Executive Branch employed the Executive Branch Custom in 2005 to make a payment of $250,000 to Bijan Mohamadipour, on behalf of public employee Dennis R. Smith, after the verdict was returned and judgment entered in Bijan Mohamadipour v. Dennis R. Smith (Suffolk Division of the Superior Court Department of the Trial Court for the Commonwealth of Massachusetts). (29/2, 3, 6).

223. Dennis R. Smith was not a constitutional, police or municipal officer.

224. This payment was barred by the Indemnification Statute because the civil rights violations at issue were committed willfully as found by the jury sitting in the Suffolk Superior Court. (29/2, 3 6).

225. The Massachusetts Executive Branch employed the Executive Branch Custom in 1999 and 2001 to make offers of settlement to Jason Davis, on behalf of public employees Paul Rennie, Richard Gillis, Michael Hanlon, Joyce Weigers and Leonard Fitzpatrick, after a verdict was returned and judgment entered upon it in the Davis Case. Davis, 264 F. 3d, at

86-117; (1/1-3; 2/1-8; 17/1-9; 18/1-16; 38/1; 50/1-11).

226.  Even these offers were barred by the Indemnification Statute because the civil rights violations at issue were committed willfully and maliciously as found by a jury sitting in this Court. Id.; (1/1-3; 2/1-8; 17/1-9; 18/1-16; 50/1-11).

227.  The Massachusetts Executive Branch employed the Executive Branch Custom in 2014 to make a settlement payment to the Estate of Joshua Messier of $2,000,000 on behalf of nine (9) public employees. (39/1-11).

228.  The settlement payment was barred by the Indemnfication Statute because the civil rights violations at issue were committed willfully, wantonly and recklessly as per a videotape which actually showed the murder on film, a death certificate which listed the manner of death as homicide, an autopsy which listed the manner of death as homicide, an autopsy which set forth the detailed and acute blunt force trauma injuries all over Joshua Messier's body (including brain bleeding), the raw fact that staff left a lifeless person (Joshua Messier) to die on a restraint table for ten (10) minutes – without doing anything to help him – after he was savagely attacked by said staff and the judicial findings of the Statewide Grand Jury as memorialized within their six true bills of indictment ("Six Messier Indictments") (40/1-6; 41/1; 42/1-11; 13/1-16; 55/1-16; 62/1-36).

229.  The Massachusetts Executive Branch, acting through the Defendant and Attorney General Andrea J. Campbell, employed the Executive Branch Custom on or about August 11, 2023 to authorize a payment of $7,000,000 to the Blouin Case Victims on behalf of 17 DCF public employees none of whom were constitutional, police or municipal officers.

230.  This $7,000,000 payment was barred by the Indemnification Statute because the civil rights violations at issue were committed willfully, maliciously and intentionally.

231. The disparate treatment about which the Plaintiff complains herein relates exclusively to the disparate treatment, and resultant discriminations, as between it, the Holyoke Victims and the Blouin Case Victims.

232. Each of Plaintiff's claim are exclusively premised upon these specific disparate treatments and discriminations none of which occurred before November 14, 2022.

233. The recitations above, as to other occasions when the Executive Branch Custom was employed by the Executive Branch, have been set forth only to demonstrate that said custom has been historically utilized in the Commonwealth of Massachusetts by its Executive Branch.

234. The actual use of the Executive Branch Custom, in the context of the Holyoke Victims, occurred no earlier than November 14, 2022 when the Class Action Settlement Agreement was approved by this Court. (32/1-7; 34/1-78).

235. The actual use of the Executive Branch Custom, in the context of the Blouin Case Victims, occurred no earlier than August 11, 2023 when the Blouin Case Settlement was announced.

236. The Executive Branch Custom perpetuates a mechanism which provides for the payment, in United States currency, of claims asserted by those injured by the willful civil rights violations of public employees who are not constitutional, police or municipal officers.

237. The Executive Branch Custom technically indemnifies the public employee for his willful civil rights violations by satisfying the claimant's claim against him.

238. United States currency, in the form of a draft, is directly remitted to the claimant when indemnification is provided pursuant to the Executive Branch Custom. (37/1; 39/1-11).

239. United States currency is a property interest under the Due Process Clause and constitutes a concurrent State law entitlement in the present context.

240. United States currency is a property interest under the Executive Branch Custom.

241. Property interests, under the Due Process and Equal Protection Clauses, include property interests which are protected and recognized by State law (Executive Branch Custom) including United States currency.

242. The administration of the Executive Branch Custom must be accomplished in compliance with both the Equal Protection and Due Process Clauses.

243. The administration of the Executive Branch Custom, in the context of this matter, was performed by the Defendant in a manner which violated both the Equal Protection and Due Process Clauses.

244. Through the Constitutional Demand Letter the Plaintiff simply requested that the Defendant, in her current capacity as the Governor of the Commonwealth of Massachusetts, treat the Plaintiff on an equal constitutional footing with the Holyoke Victims each one of whom (164 victims) had their willful civil rights violations indemnified under the Executive Branch Custom in accord with the Class Action Settlement Agreement. (3/10-12; 32/1-7; 33/1-40; 34/1-78).

245. Through the Constitutional Demand Letter the Plaintiff simply demanded that the Defendant, in her capacity as the Governor of the Commonwealth of Massachusetts, treat the Plaintiff in the same manner as the Executive Branch treated the Holyoke Victims by indemnifying the willful civil rights violations of the non-constitutional officer public employees who savagely attacked Jason Davis on August 12, 1993. (3/10-12).

246. Though the Executive Branch Custom, in the context of the Holyoke Victims, was implemented by the Massachusetts Executive Branch, acting by and through Governor Baker, its use cannot now be limited to these victims alone lest the Equal Protection Clause, Due Process Clause and Executive Branch Custom would be violated.

247. Jason Davis and the Holyoke Victims were similarly circumstanced because *inter alia:* (i) they were in the custody of the Commonwealth of Massachusetts in long term healthcare facilities; (ii) the Commonwealth of Massachusetts had a constitutional obligation to each of them to care for and treat them in a medically appropriate manner under the Due Process Clause; (iii) the Commonwealth of Massachusetts had a constitutional obligation to physically protect them from harm while they were within their respective long term healthcare facilities; (iv) they were subjected to barbaric, grotesque and vile medical "treatment" modalities which caused great physical and other injuries; (v) they were subjected to willful, wanton, reckless and intentional civil rights violations at the hand of public employees; (vi) these public employees were not constitutional, police or municipal officers; and (vii) judicial determinations were made that none of the culprits involved in these cases acted in a manner which would have permitted indemnification under the Indemnification Statute.

248. Jason Davis and the Blouin Case Victims were also similarly circumstanced due to the grotesque, grizzly, obscene and vile conduct to which they were all subjected.

249. The Equal Protection Clause commands that all similarly circumstanced persons must be treated alike relative to the administration of property rights protected by the Constitution.

250. A central purpose of the Equal Protection Clause is to protect persons from discrimination which is arbitrary, capricious, invidious and intentional relative to the administration of property rights protected by the Constitution.

251. Unjustifiable and acute discrimination, which is arbitrary in nature, concurrently violates the Due Process Clause.

252. The Davis Estate is cognizant of the fact that Will v. Michigan, 491 U.S. 58-71 (1989) permits States to uniformly refuse to ***pay any claims*** seeking monetary damages under the Federal Civil Rights Act but what States cannot constitutionally do – as the Defendant and the Massachusetts Executive Branch did here – is to arbitrarily, whimsically and capriciously pay some of these claims but not others.

253. Caprice and differentiations in treatment live in vacuums like this and violate both the Equal Protection and the Due Process Clauses.

254. Neither the Defendant nor the Commonwealth of Massachusetts can now constitutionally concoct eligibility criteria, to exclude Plaintiff from being a member of the class of persons protected by the Executive Branch Custom, insofar as any such criterion would violate the fair notice provision of the Due Process Clause.

255. Laws which regulate persons, entities and the administration of constitutionally protected property rights must fairly notify all those affected so that each of them may know in advance the conduct required of them.

256. There were 164 Holyoke Victims who were indemnified in the Class Action through the Executive Branch Custom. (32/1-7; 33/1-40; 34/1-78).

257. There were 4 Blouin Case Victims who were indemnified in the Blouin Case through the Executive Branch Custom.

258. There are a total of 168 class members ("Class Members"), between the Holyoke Victims and the Blouin Case Victims, each one of whom received indemnification for civil rights violations: (i) which were not indemnifiable under any section of M.G.L. c. 258; (ii) under and pursuant to the Executive Branch Custom; and (iii) committed by a public employee who was not a constitutional, police or municipal officer.

259. The Plaintiff has a constitutional right, under the Due Process and Equal Protection Clauses, to: (i) be included within the class ("Class") of all Holyoke and Blouin Case Victims whose federal civil rights were indemnified under the Executive Branch Custom; and (ii) receive equal treatment, as a Class Member, relative to the administration of these property related rights.

260. Though the Plaintiff can granularly prove that it is "similarly circumstanced" with all Class Members it need not constitutionally prove anything more than it was subject to civil rights violations not indemnifiable under the Indemnfication Statute, at the hand of Commonwealth employees who were not constitutional, police or municipal officers, because no eligibility criteria has ever been articulated by the Massachusetts Executive Branch, relative to the Executive Branch Custom, beyond this very limited and only implied criteria.

261. Each of the above facts are proven through the <u>Davis</u> reported cases alone.

262. Through her failure to respond to the Constitutional Demand Letter the Defendant not only denied the relief sought but excluded Plaintiff from the Class which exclusion *itself* violated the Equal Protection and Due Process Clauses. (3/1-23; 16/1-16).

263. The refusal ("Refusal" or "Refused") by the Defendant, to honor the demand in the Constitutional Demand Letter to indemnify the willful civil rights violations committed

by the non-constitutional officer public employees who savagely attacked Jason Davis on August 12, 2023, violated the Equal Protection and Due Process Clauses thereby proximately causing Plaintiff to sustain injury, injury in fact and damages including, to wit, the failure to receive indemnification under the Executive Branch Custom in the amount of 2.57M.

264.   Defendant's Refusal implemented willful, reckless, intentional, arbitrary, capricious, whimsical, deliberately indifferent and invidious discrimination (collectively "Discrimination") by her, as between the Class Members and the Plaintiff, which discrimination proximately caused Plaintiff to sustain injury, injury in fact and damages including, to wit, the failure to receive indemnification under the Executive Branch Custom in the amount of 2.57M all in violation of the Due Process Clause, Equal Protection Clause and the Executive Branch Custom.

265.   Defendant's Refusal implemented Discrimination, as between the Holyoke Victims and the Plaintiff, which Discrimination proximately caused Plaintiff to sustain injury, injury in fact and damages including, to wit, the failure to receive indemnification under the Executive Branch Custom in the amount of 2.57M all in violation of the Due Process Clause, Equal Protection Clause and the Executive Branch Custom.

266.   Defendant's Refusal implemented Discrimination, as between the Blouin Case Victims and the Plaintiff, which Discrimination proximately caused Plaintiff to sustain injury, injury in fact and damages including, to wit, the failure to receive indemnification under the Executive Branch Custom in the amount of 2.57M all in violation of the Due Process Clause, Equal Protection Clause and the Executive Branch Custom.

267.   The Discrimination deprived Plaintiff of its fundamental right to and liberty interest in the just, fair, impartial, neutral, equal and even-handed application of the Executive Branch Custom, relative to the Class Members and Plaintiff, under the Equal Protection Clause, the Due Process Clause and the Executive Branch Custom.

268.   The Discrimination effectuates no compelling or any other governmental interest.

269.   The constitutionally prohibited Discrimination perpetuates and proximately results in the Plaintiff's possession of an absolute, unqualified and impenetrable claim of entitlement, against Defendant, including, to wit, indemnification under the Executive Branch Custom in the amount of 2.57M.

270.   It took Governor Baker **179 days** to secure $57,912,500 for the 164 Holyoke Victims.

271.   It has been **232 days** since the Defendant received the Constitutional Demand Letter but she Refused to provide the relief requested therein while also failing to secure the monies demanded in the Constitutional Demand Letter.

272.   A number of State and federal officials, including Defendant, have expressed sentiments which support the proposition that the Davis Estate would be a worthy member of the Class of persons who benefit from the Executive Branch Custom.

273.   On August 29, 2020 Senator Edward M. Markey stated, in the Boston Herald, that "Jason Davis deserves justice and his family is owed their full settlement."

274.   On August 29, 2020 Senator Elizabeth Warren stated, in the Boston Herald, that "Jason Davis and his family deserve justice – including the full settlement they're owed."

275.   On May 13, 2014 the Defendant, then an Assistant Attorney General, emailed the Davis Estate therein indicating that the Davis Case was "a very sad situation." (4/1-2).

276.    On June 4, 2014 current Senate President Karen E. Spilka emailed the Davis Estate
therein stating that: "[c]learly these are issues - both mental health and the Davis matter -
that are very, very important to me." (9/1; brackets supplied).

277.    In 2014 Representative Rogers said this about the Jason Davis case: (i) "The facts are
uncontested. They [Department of Mental Health] hired, failed to train and failed to
supervise these workers and to allow the State to walk away is just wrong;" (WCVB TV)
and (ii) "In my mind the liability of the Commonwealth has always been crystal clear."
(Boston Globe). (brackets and parenthesis supplied).

278.    After Jason Davis' legal team outlined some of the egregious governmental corruption in
the Jason Davis case, to First Assistant Attorney General Pat Moore on April 10, 2023 in
Boston, Massachusetts, he was moved to say that "the Jason Davis case never should have
happened. If our office were involved in this case it never would have been defended like
it was; if at all." He then asked "how should we pay this?" (49/2). See Count III infra.

279.    The Davis Estate would also be a worthy member of the Class of persons who benefit
from the Executive Branch Custom given his hero status in national legal circles.

280.    The Davis series of reported federal cases set forth some of the most profoundly
important constitutional protections for the mentally ill ever articulated by the
Federal Courts for our Nation. See Davis v. Rennie, 264 F. 3d 86-117 (1st Cir.
2001); Davis v. Rennie, 997 F. Supp. 137-140 (D. Mass. 1998); Davis v. Rennie, 553 U.S.
1053 (2002).

281.    Shepard's Citator service informs us that at least 187 Courts from around the Nation have
cited the Davis opinion, issued by First Circuit in 2001, in their reported opinions and that
another 121 legal commentators have cited this opinion in their literature.

282.    This opinion likely has been cited tens of thousands of times in unreported cases.

283.    This opinion is, without question, a landmark Federal Civil Rights decision as is the one issued in the District Court Proceeding. <u>Ibid</u>.

284.    Though he was a national legal hero during his life, given the substantial contributions which he made to our national constitutional landscape, Jason Davis was never able to obtain justice on his native soil though the Constitution commanded it.

285.    The Defendant willfully, recklessly, intentionally, arbitrarily, capriciously, whimsically, deliberately indifferently and invidiously discriminated against Plaintiff thereby proximately depriving it of the recited privileges, rights and immunities, as secured and guaranteed by the Equal Protection Clause, Due Process Clause, the Executive Branch Custom and the laws of the United States, thus proximately causing Plaintiff to sustain injury, injury in fact and damages including, to wit, its failure to receive indemnification under the Executive Branch Custom in the amount of 2.57M.

Wherefore, it is demanded that:

A.    This Honorable Court enter judgment for the Plaintiff on all of its claims for the amount owed under the Third Amended Judgment, accumulated interest and all other damages sustained by Plaintiff;

B.    The Plaintiff be awarded compensatory damages in the amount of $2,574,901 together with per diem interest of $139.40 up to and including the date of payment;

C.    The Plaintiff be awarded prejudgment and postjudgment interest;

D.    The Plaintiff be awarded attorneys' fees, costs, taxable costs, taxable expenses and expenses pursuant to 42 U.S.C. § 1988 and applicable federal rules of civil procedure;

E.    The Plaintiff be awarded punitive damages against the Defendant in an amount no less than $23,000,000; and

F.  The Plaintiff be awarded punitive damages in an amount which is at the outer most limit of permissibility under the Due Process Clause of the Fourteenth Amendment.

## COUNT II - 42 U.S.C. § 1983

### PUNITIVE DAMAGES

### DUE PROCESS AND EQUAL PROTECTION CLAUSES
### FOURTEENTH AMENDEMENT
### UNITED STATES CONSTITUTION

### [WILLIAM H. DAVIS, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JASON H. DAVIS, PLAINTIFF v. MAURA T. HEALEY, DEFENDANT]

286.  The Plaintiff incorporates herein by reference all paragraphs hereinbefore and hereinafter set forth as if specifically set forth herein.

287.  This count is parasitical to and actually a sub-claim of Count I above.

288.  The Davis Estate does not use the word "evil" in this Complaint and punitive damage sub-claims as hyperbole but it is instead utilized to depict a certain level of culpability under the Federal Civil Rights laws. See 42 U.S.C. §1983; Smith v. Wade, 461 U.S. 30, 56 (1983).

289.  Webster's New Collegiate Dictionary defines evil as "morally reprehensible, sinful, wicked, arising from actual or imputed bad character or conduct, causing discomfort or repulsion." Webster's New Collegiate Dictionary, p. 393 (9th Ed. 1979).

290.  Prior to, upon and following her receipt of the Constitutional Demand Letter the Defendant knew that the Class Action Settlement Agreement violated the Due Process and Equal Protection Clause rights of the Plaintiff and would continue to do so if she did not forthwith cause the Davis Case Third Amended Judgment to be paid in full.

291.    Prior to, upon and following her receipt of the Constitutional Demand Letter the Defendant knew that the Class Action Settlement Agreement proximately caused the Plaintiff to be injured and damaged in violation of the Due Process and Equal Protection Clauses.

292.    The Equal Protection and Due Process Clause violations, set forth in the Constitutional Demand Letter, are extremely crude in nature and were easily understood by Defendant given the fact that she: (i) was the Attorney General for eight years; (ii) was an Assistant Attorney General for eight years; (iii) served as the head of the Civil Rights Bureau while an Assistant Attorney General and was in charge of said bureau for eight years while Attorney General; (iv) has been a Civil Rights Attorney for all 16 of the years that she was employed at the Attorney General's Office; and (v) has been a practicing lawyer for 25 years.

293.    Defendant's Refusal implements an outrageous, malicious, callous, wanton and evil Discrimination by her, relative to three similarly circumstanced sets of claimants (Davis Estate, Holyoke Victims and the Blouin Case Victims), which discrimination proximately caused Plaintiff to be deprived of its property rights, under the Equal Protection Clause, Due Process Clause and Executive Branch Custom, thereby proximately causing Plaintiff to sustain injury, injury in fact and damages including, to wit, the failure to receive indemnification under the Executive Branch Custom in the amount of 2.57M.

294.    The Defendant's subjective, actual and personal knowledge of her violations of the Due Process and Equal Protection Clause rights of the Plaintiff emanated from the clarity of

the facts and legal principles, as set forth within the Constitutional Demand Letter, coupled with the Defendants' ability to easily comprehend these substantive principles.

295.   The Refusal, in and of itself, establishes an independent factual predicate for punitive damages due to its inherently evil and illegal nature insofar as there was no constitutional basis upon which to deny the relief sought in the Constitutional Demand Letter.

296.   The Defendant acted outrageously, maliciously, callously, wantonly and evilly relative to her deprivations of Plaintiff's constitutional rights.

297.   The Defendant's conduct was extreme and outrageous and was prompted by ill will.

298.   The Defendant's conduct was motivated by an evil motive, intent and eye.

299.   The Defendant's conduct was motivated by an unequal hand.

300.   The Defendant had a malicious design and intent to and, in fact, did deprive Plaintiff of the privileges, rights and immunities, which were secured and guaranteed to it by the Constitution and the laws of the United States, such design and intent being implemented by her.

Wherefore, it is demanded that:

A.   This Honorable Court enter judgment for the Plaintiff on all of its claims for the amount owed under the Third Amended Judgment, accumulated interest and all other damages sustained by the Plaintiff;

B.   The Plaintiff be awarded compensatory damages in the amount of $2,574,901 together with per diem interest of $139.40 up to and including the date of payment;

C.   The Plaintiff be awarded prejudgment and postjudgment interest;

D.   The Plaintiff be awarded attorneys' fees, costs, taxable costs, taxable expenses and expenses pursuant to 42 U.S.C. § 1988 and applicable federal rules of civil procedure;

E. The Plaintiff be awarded punitive damages against the Defendant in an amount no less than $23,000,000; and

F. The Plaintiff be awarded punitive damages in an amount which is at the outer most limit of permissibility under the Due Process Clause of the Fourteenth Amendment.

### COUNT III - 42 U.S.C. § 1983

### PUNITIVE DAMAGES

### DUE PROCESS AND EQUAL PROTECTION CLAUSES
### FOURTEENTH AMENDEMENT
### UNITED STATES CONSTITUTION

### [WILLIAM H. DAVIS, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JASON H. DAVIS, PLAINTIFF v. MAURA T. HEALEY, DEFENDANT]

301. The Plaintiff incorporates herein by reference all paragraphs hereinbefore and hereinafter set forth as if specifically set forth herein.

302. This count is parasitical to and a sub-claim of Count I above.

303. Black's Law Dictionary defines corrupt as "spoiled; tainted; vitiated; depraved; debased; morally degenerate. As used as a verb, to change one's morals and principles from good to bad." Black's Law Dictionary, p. 311 (5th Ed. 1979).

304. Black's Law Dictionary defines corruption as "an act done with an intent to give some advantage inconsistent with official duty and the rights of others. The act of an official or fiduciary person who unlawfully and wrongfully uses his station or character to procure some benefit for himself or for another person, contrary to duty and the rights of others." Id.

305. The Defendant has personal knowledge of the corruption ("Corruption") to which the Davis Estate, and Jason Davis before it, was subjected before her Refusal.

306. The Defendant personally participated in this Corruption.

307. The Refusal constitutes but the latest component in a chain of legally documented governmental corruption which dates back to the savage attack of Jason Davis on August 12, 1993.

308. The Defendant had personal knowledge of all of the Corruption committed in the Davis Case, prior to and as of January 23, 2023 when she was first served with the Constitutional Demand Letter, by virtue of these documents ("Corruption Documents"):

    A. The Constitutional Demand Letter and its twelve (12) exhibits (3/1-23; Ex. 4-16);

    B. The Demand Letter forwarded to Governor Deval Patrick in 2014 (44/1-36);

    C. The Demand Letter forwarded to Attorney General Martha Coakley in 2014 (45/1-18); and

    D. The Demand Letter forwarded to the Defendant in 2017 (46/1-60).

309. The Corruption was detailed again for the Executive Branch in 2023 ("Campbell Documents") through a series of letters and emails remitted to Attorney General Andrea J. Campbell including the following:

    A. The letter forwarded to Attorney General Andrea J. Campbell on February 28, 2023 (47/1-17)

    B. The email forwarded to Attorney General Andrea J. Campbell on June 13, 2023 (43/1-2); and

    C. The letter forwarded to Attorney General Andrea J. Campbell on June 13, 2023 detailing, as it did, the dispositive effect which the Twenty Holyoke Indictments and the Supreme Judicial Court opinion in Clinton v. Commonwealth has upon the Claim in Count I. (49/3-5, 1-5; 35/1-20; 36/1-40).

310. The Defendant had personal knowledge of the Corruption, as recounted in the Corruption and Campbell Documents, when she Refused to timely or otherwise grant the relief demanded in the Constitutional Demand Letter.

311. The Corruption is also memorialized in federal court filings made in three federal courts, reported federal opinions, trial exhibits, court orders, motions, briefs, notices of appearance, legislative documents and documents generated by various governmental officials of which the Defendant had personal knowledge.

312. The Defendant engaged in Corruption, as Assistant Attorney General, Attorney General and now as Governor, and has longstanding and actual knowledge of it in the context of the Davis Case.

313. Attorney General Scott Harshbarger represented all of the Davis Attackers in this court except Phillip Bragg.

314. Attorney General Scott Harshbarger commenced representing Charge Nurse Joyce Weigers after the 1998 Davis Case trial had concluded in this court.

315. Attorney General Scott Harshbarger represented the remaining Davis Attackers in this court from on or about September, 1996 to on or about January 5, 1999 when Attorney General Thomas Reilly continued this representation in this court, the First Circuit and the Supreme Court after having been sworn in as the succeeding Attorney General.

316. Attorney General Scott Harshbarger was a lawyer and a civil rights lawyer prior to 1996.

317. Attorney General Scott Harshbarger was in charge of the Civil Rights Bureau at the Attorney General's Office from 1991 – 1999 while he served as Attorney General for the Commonwealth.

318. Attorney General Thomas Reilly represented all the Davis Attackers, except Phillip Bragg, in this court, the First Circuit and the Supreme Court.

319. Attorney General Thomas Reilly was a lawyer prior to 1999.

320. Attorney General Thomas Reilly was in charge of the Civil Rights Bureau at the Attorney General's Office from 1999-2007 while he served as Attorney General for the Commonwealth.

321. Massachusetts Attorneys General are legally foreclosed from engaging in litigation, on behalf of but a few clients, if doing so "will not further the interests of the Commonwealth and the public." Clerk of Superior Court for Middlesex County v. Treasurer and Receiver General, 386 Mass. 517, 526, 437 N.E. 2d 157, 163 (1982).

322. "The State has a duty to protect incarcerated prisoners and involuntarily committed mental patients from harm by a state actor..." under the Due Process Clause. Davis, 264 F. 3d, at 97-98; Deshaney, 489 U.S., at 199 – 200; Youngberg, 457 U.S., at 314-324.

323. The Commonwealth has had this duty since no later than 1982. Id.

324. The Davis Attack occurred in 1993.

325. State Attorneys General simply cannot "protect" the committed mentally ill, as required of them under the U.S. Constitution, if they defend their attackers in the courts.

326. Attorney General Scott Harshbarger defended Jason Davis' attackers in this court which was corrupt because it was in derogation of his obligation to protect Jason Davis and his class members under the Constitution.

327. Attorney General Thomas Reilly defended Jason Davis' attackers in this court, the First Circuit and the Supreme Court which was corrupt because it was in derogation of his obligation to protect Jason Davis and his class members under the Constitution.

328. Attorneys General Scott Harshbarger and Thomas Reilly should have, consistent with their oaths of office, caused the Davis Attackers to be criminally indicted instead of defending them in three federal courts.

329. This tact would have protected Jason Davis and the entire class of committed mentally ill patients here in the Commonwealth.

330. Three years before Attorney General Harshbarger first began his representation of the Davis Attackers there was already a voluminous factual record generated by the Massachusetts Executive Branch, which included arrest and incident reports authored by the very State Police Officer who intervened at the scene (Gregg Plesh) to save Jason Davis' life, which depicted the grotesque, barbaric and savage attack on Jason Davis by the Davis Attackers on August 12, 1993. (2/1-8).

331. After the one-month trial in this court the whole World came to know of the grizzly, grotesque, barbaric and savage attack of Jason Davis by the Davis Attackers as recounted by this court, the First Circuit and as set forth in numerous trial transcripts. (2/1-8; 14/1-17; 15/1-16; 17/1-9; 18/1-16; 20/1; 50/1-11); <u>Davis</u>, 264 F. 3d, at 86 – 117; <u>Davis</u>, 997 F. Supp., at 137-140.

332. Attorney General Reilly appealed the final judgement of this court in the Davis Case, on behalf of all Davis Attackers except Phillip Bragg, to the First Circuit and then filed a certiorari proceeding ("Certiorari Proceeding") in the Supreme Court on their behalf notwithstanding the grizzly, grotesque and barbaric record amassed well before and during trial.

333. Attorneys General Scott Harshbarger and Thomas Reilly both represented twice convicted armed robber Paul Rennie and all Davis Attackers who pinned Jason Davis to the floor of the ward so that Phillip Bragg could literally try to murder him.

334. In this court, the First Circuit and the Supreme Court Attorney General Thomas Reilly also represented Charge Nurse Joyce Weigers notwithstanding the fact that: (i) Attorney General

Harshbarger did not represent her in this court before trial; (ii) the jury found that her conduct toward Jason Davis was as evil or more evil than any other Davis Attacker as exhibited by the $500,000 punitive damage award assessed against her by said jury; (iii) she perjured herself under oath in this court; (iv) she asserted false allegations of wrongdoing against hero State Police Officer Greg Plesh; (v) she falsified medical records in an attempt at a coverup; (vi) she refused to stop the attack as it was ongoing despite being requested to do so, at the scene, by the State Police Officer who saved Jason Davis' life'; and (vii) she said this to Jason Davis after the attack: "[t]his is what you get when you act – this is what you get when you act like this..." as recounted by said State Police Officer. Davis, 264 F. 3d, at 94-95, 97-99, 112-117, 86-117; (1/1-3; 2/1-8; 14/1-17; 15/1-16; 17/1-9; 18/1-16; 50/1-11; 51/1-2).

335.   There simply was no justice, in taking on Joyce Weigers' appellate cases, it was just a matter of Attorney General Thomas Reilly "circling the wagons", attempting to redirect blame against State institutions, trying to advance his perverse legal theories and eliminating ostensibly inconsistent contentions by private counsel which could obscure the "win at any cost" mentality espoused by him and Attorney General Scott Harshbarger in the District Court Proceeding.

336.   When Attorneys General Scott Harshbarger and Thomas Reilly defended ("Representation") the Davis Attackers in this court, the First Circuit and the Supreme Court they engaged in corruption insofar as: (i) they illegally used the Attorney General's Office to benefit the Davis Attackers in direct violation of their constitutional duty to "protect" committed mentally ill patient Jason Davis and the entire class of committed mentally ill inpatients; (ii) such representation violated their oaths of office which

required them to uphold the laws of the Commonwealth which they did not do; (iii) such representation was depraved, debased and morally degenerate; and (iv) such representation directly violated State law which forbids representation of this type because it required them to take legal positions adverse to the entire class of committed mentally ill inpatients here in the Commonwealth. See Clerk of Superior Court for Middlesex County, 386 Mass., at 526.

337. In this court, the First Circuit and the Supreme Court Attorneys General Scott Harshbarger and Thomas Reilly asserted legal positions which: (i) directly violated their constitutional obligation to protect Jason Davis and the committed mentally ill as a class; and (ii) were corrupt.

338. The principal legal position asserted by Attorneys General Scott Harshbarger and Thomas Reilly, in this court, the First Circuit and the Supreme Court, was that the United States Constitution does not obligate Doctors, Nurses and Mental Health Care Workers to stop one of their fellow employees from savagely brutalizing a committed mentally ill inpatient even if they have the time, opportunity and ability to do so. Davis, 264 F. 3d, at 97-99, 112-117.

339. This legal position was entirely based upon and wholeheartedly embraced the concept that Doctors, Nurses and Mental Health Care Workers can simply look away and do nothing when the committed mentally ill are being savagely brutalized, in their presence, by fellow employees.  Davis, 264 F. 3d, at 97-99, 112-117.

340. **This legal position was asserted by Attorneys General Scott Harshbarger and Thomas Reilly in an express attempt by them to absolve the Davis Attackers – specifically those who pinned Jason Davis to the floor of the ward so that Phillip**

**Bragg could literally try to murder him and the Charge Nurse who cheered on the attack – of all liability.** <u>Davis</u>, 264 F. 3d, at 97-99, 112-117.

341. This legal position, if embraced, would have forever jeopardized the safety of all committed mentally ill inpatients in this State and the entire First Circuit.

342. This legal position amounted to a request for a license to kill, maim and injure the committed mentally ill as sought by two of our Attorneys General under the guise of qualified immunity.

343. This court, the First Circuit and then the Supreme Court, through its denial of the Commonwealth's Certiorari Petition, rejected this flawed constitutional contention by resorting to age old and fundamental Supreme Court precedent. (50/5-11; 21/1); <u>See Youngberg</u>, 457 U.S., at 314-324; <u>Deshaney</u>, 489 U.S., 199-200; <u>Davis</u>, 264 F. 3d, at 97-99, 112-117.

344. Attorneys General Scott Harshbarger and Thomas Reilly not only attempted to disadvantage an entire class of our most vulnerable citizens but their unsuccessful attempt to do so was predicated upon a perverse view of the law which was entirely at odds with long standing constitutional protections for the committed mentally ill. <u>Id</u>.

345. This legal position was barbaric and evil.

346. This legal position evidenced a "win at any cost" mentality even if it meant: (i) enacting a law which would lead to the killing, maiming and injuring of the committed mentally ill; and (ii) wrongfully depriving a committed mentally ill inpatient (Jason Davis) of justice.

347. The legal position constituted a crime under the criminal arm of the Federal Civil Rights Act. <u>See</u> 18 U.S.C. §242.

348. When Attorneys General Scott Harshbarger and Thomas Reilly asserted this legal position they engaged in corruption insofar as: (i) they illegally used the Attorney General's Office to benefit the Davis Attackers in direct violation of their federal constitutional duty to "protect" committed mentally ill patient Jason Davis and the entire class of committed mentally ill inpatients; (ii) they violated their oaths of office which required them to uphold the laws of the Commonwealth which they did not do; (iii) they asserted positions which were depraved, debased and morally degenerate; and (iv) they violated State law which forbids the assertion of these types of legal positions by State Attorneys General because they are adverse to the entire class of committed mentally ill inpatients here in the Commonwealth. See Clerk of Superior Court for Middlesex County, 386 Mass., at 526.

349. A nuance of the Due Process Clause is that a person must be an involuntarily committed mentally ill inpatient to enjoy its protections while an inpatient at a State operated mental health facility. Deshaney, 489 U.S., at 199-200; Youngberg, 457 U.S., at 314-324; Davis, 264 F. 3d, at 97-99, 112-117.

350. If such a patient is not an involuntarily committed inpatient they simply cannot assert civil rights claims, under the Due Process Clause, and would have no ability to bring a federal civil rights case based on these types of claims.

351. Attorney General Scott Harshbarger attempted to dismiss ("Motion to Dismiss") the entire Davis Case premised upon the legally, factually and medically baseless contention that Jason Davis was not involuntarily committed to the Hospital on May 12, 1993 and, in so doing, he unconstitutionally and intentionally attempted to disadvantage not only Jason Davis but the entire class of committed mentally ill patients.

352. Attorney General Scott Harshbarger's contention, in this regard, was that since Jason Davis had "voluntarily" signed himself into the Hospital, via a "voluntary admission form", he was not entitled to any Due Process Clause relief whatsoever and thus could not assert any civil rights claim or case against any person who attacked him on August 12, 1993.

**353. Attorney General Scott Harshbarger asserted this legal position in an express attempt to absolve all Davis Attackers of all liability and have the claims asserted against them dismissed.**

354. Attorney General Scott Harshbarger's specious contention was easily disproved by resort to age old and long standing Supreme Court precedent which prevents mentally ill patients from "voluntarily" admitting themselves into a State mental hospital while medically incompetent. See Zinermon, 494 U.S., at 131-134.

355. Since no later than 1990 "voluntary admission forms", executed by patients who are incompetent, have had no constitutional force and effect and any putative "admission" is constitutionally transformed into an involuntary commitment. Id., at 131-134.

356. Long standing psychiatric, medical and contractual principles literally predate this 1990 constitutional ruling by several decades.

357. This legal principle was known by Attorney General Scott Harshbarger when he was a law school student.

358. This court determined that there was not even a shred of viability to any legal, factual or medical argument made by Attorney General Scott Harshbarger, in regard to his Motion to Dismiss, as per this court's reported federal opinion. See Davis, 997 F. Supp., at 137 – 140.

359. The reported opinion by this court constituted a searing rebuke of a sitting State Attorney General insofar as the court specifically held that all of Attorney General Scott Harshbarger's contentions were legally, factually and medically baseless. Id.

360. Quotes from this court's reported opinion include lengthy excerpts and references to uncontroverted deposition transcripts of the psychiatrists who consulted with Jason Davis on the very day (May 12, 1993) he was discharged from one hospital (McClean Hospital – Dr. Goodman) and "admitted" (committed) into another (Westborough State Hospital – Dr. MacDonald). Id.

361. This court determined that when Jason Davis signed a "voluntary admission form" on May 12, 1993 he was incompetent, incapable of exercising informed consent, psychotic, acutely paranoid, acutely psychotic, delusional and hallucinogenic and thus incapable of legally executing such form which constitutionally transformed his putative "admission" into an involuntary commitment. Davis, 997 F. Supp., at 137 – 140; Zinermon, 494 U.S., at 131-134.

362. Attorney General Scott Harshbarger knew that Jason Davis was incompetent, incapable of exercising informed consent, psychotic, acutely paranoid, acutely psychotic, delusional and hallucinogenic well before he even filed his Motion to Dismiss because each of these uncontroverted medical diagnoses were actually codified in two deposition transcripts, relative to two psychiatrists, which were generated well before said motion was even filed yet he forged ahead anyway knowing full well that Jason Davis was medically incompetent on May 12, 1993. Davis, 997 F. Supp., at 137 – 140.

363. The May 12, 1993 medical records alone, from McLean Hospital and the Hospital, told this identical story.

364. This court held as follows: "….[o]n May 12, 1993, Davis was legally and medically incompetent to appropriate the significance of his action in signing any admission document and…his admission to Westborough State Hospital on that day was therefore involuntary." Id., at 138. (brackets supplied).

365. This court first set forth the rather detailed and uncontroverted deposition testimony of Dr. MacDonald before it held that "[a]s vivid as are the statements quoted above, they constitute only the climax of Dr. MacDonald's 121-page deposition. Nothing stated by Dr. MacDonald in his deposition is inconsistent with the conclusions quoted above. **The defendants have offered no evidence in affidavit form or otherwise, to challenge or refute any of Dr. MacDonald's testimony (which is of course consistent with that of Dr. Goodman)."** Id., at 139 (parenthesis in original; brackets and emphasis supplied).

366. This court then held that "[i]n Zinermon, [v. Burch, 494 U.S. 113, 131-134 (1990)] the fact that a patient was incompetent to exercise informed consent as a voluntary admission demonstrated that his presence in the institution was involuntary. Defendants turn this logic upside-down by arguing that the lack of proper procedures for involuntarily committing a patient shows that his presence is voluntary." Id., at 140 (brackets supplied).

367. Attorney General Harshbarger was attempting to return the law to a time, before Zinermon, when incompetent mentally ill inpatients were stripped of their constitutional rights at the front door by virtue of their execution of "voluntary admission forms."

368. This legal position, if embraced, would have forever jeopardized the safety of all committed mentally ill inpatients in this State and the entire First Circuit.

369. This legal position amounted to a request for a license to kill, maim and injure the committed mentally ill because none of them would have had any civil rights remedy

once inside the institution, following their having "admitted" themselves "voluntarily" while incompetent, thus immunizing all staff from civil rights liability.

370. It would have been a "win-win" situation for the Commonwealth: incompetent patients "voluntarily admit" themselves while concurrently depriving themselves of all civil rights claims arising when they are killed, maimed or injured by staff.

371. The mentally ill would have been waiving their constitutional claims in masse at the front doors of the Commonwealth's mental health facilities had Attorney General Scott Harshbarger prevailed on his legal position.

**372. Attorney General Scott Harshbarger expressly sought to strip Jason Davis of all of his constitutional rights, at the front door of the Hospital and while medically incompetent, in order to absolve all Davis Attackers of their civil rights liabilities.**

373. Attorney General Scott Harshbarger not only attempted to disadvantage an entire class of our most vulnerable citizens but his unsuccessful attempt to do so was predicated upon a perverse view of the law which was entirely at odds with long standing constitutional protections for the committed mentally ill.

374. This legal position was barbaric and evil.

375. This legal position evidenced a "win at any cost" mentality even if it meant: (i) enacting a law which would lead to the killing, maiming and injuring of the committed mentally ill; and (ii) wrongfully depriving a committed mentally ill inpatient (Jason Davis) of justice.

376. The legal position constituted a crime under the criminal arm of the Federal Civil Rights Act. See 18 U.S.C. §242.

377. When Attorney General Scott Harshbarger asserted this legal position he engaged in corruption insofar as: (i) he illegally used the Attorney General's Office to benefit the

Davis Attackers in direct violation of his federal constitutional duty to "protect" committed mentally ill patient Jason Davis and the entire class of committed mentally ill inpatients; (ii) he violated his oath of office which required him to uphold the laws of the Commonwealth which he did not do; (iii) he asserted positions which were depraved, debased and morally degenerate; and (iv) he violated State law which forbids the assertion of these types of legal positions by State Attorneys General because they are adverse to the entire class of committed mentally ill inpatients here in the Commonwealth. See Clerk of Superior Court for Middlesex County, 386 Mass., at 526.

378. During informal mediation on April 30, 1998 Attorney General Scott Harshbarger proposed a settlement ("Settlement Offer") in the amount Five Hundred Thousand ($500,000) Dollars with two caveats: (i) Jason Davis' lawyers take $166,666.66; and (ii) Jason Davis take absolutely nothing because he owed "back rent."

379. Jason Davis owed no "back rent" insofar as his three inpatient stays at the Westborough State Hospital were paid for by health insurance which he then had.

380. This Settlement Offer was corrupt because it was violative of the Due Process Clause, criminal in nature, unethical under the rules governing attorney conduct, depraved, debased and morally degenerate.

381. This Settlement Offer was corrupt because Attorney General Scott Harshbarger: (i) was attempting to use the Attorney General's Office to benefit the Davis Attackers in direct violation of his constitutional duty to protect Jason Davis and all his class members; (ii) violated his oath of office which required him to uphold the laws of the Commonwealth which he did not do; and (iii) violated State law which forbids offers of this type from being made by State Attorneys General because they are adverse to mentally ill person to

whom they are made and the entire class of committed mentally ill inpatients here in the Commonwealth. See Clerk of Superior Court for Middlesex County, 386 Mass., at 526.

382. Jason Davis rejected this Settlement Offer because it was violative of the Due Process Clause, criminal in nature, unethical under the rules governing attorney conduct, depraved, debased and morally degenerate.

383. On the date of the of the initial pretrial conference in the Davis case, which was held in the "old" Federal Courthouse in Boston, Massachusetts in May of 1998, an assistant Attorney General, Richard H. Spicer, Esquire, approached two of Davis' lawyers (Christopher M. Perry and Brendan J. Perry) in a hallway abutting the courtroom where the pretrial conference was scheduled to be held.

384. Richard H. Spicer then informed the Attorneys Perry that Attorney General Scott Harshbarger "had a message for you (Christopher M. Perry)."

385. The message was as follows: "Mr. Perry, Scott [Harshbarger] wanted me to tell you that he will pay the entire jury verdict if you win but that he will never have to pay you because you will never win." (brackets supplied).

386. The 2.57M judgment remains unpaid because Attorney General Scott Harshbarger refused to honor his promise.

387. This settlement offer and the subsequent failure to comply with it was corrupt because Attorney General Scott Harshbarger: (i) used the Attorney General's Office to benefit the Davis Attackers in direct violation of his constitutional duty to protect Jason Davis and all his class members; (ii) violated his oath of office which required him to uphold the laws of the Commonwealth which he did not do; and (iii) violated State law which forbids "offers" of this type from being made by State Attorneys General because they are adverse to

mentally ill person to whom they are made and the entire class of committed mentally ill inpatients here in the Commonwealth because "offers" made by our Attorney General should not amount to fraudulent and deceptive acts and practices. See Clerk of Superior Court for Middlesex County, 386 Mass., at 526.

388. The written hiring policy ("Hiring Policy"), which perpetuated the hiring of convicted violent felons in direct patient care capacities within the DMH, was promulgated by the DMH in 1987. (52/1-7).

389. This is the same policy pursuant to which convicted violent felons, including Phillip Bragg and Paul Rennie, were hired to engage in direct patient care capacities.

390. This policy existed during the tenure of Attorney General Scott Harshbarger (1991-1999) who did nothing to protect the committed mentally ill from said policy or revise it.

391. This policy was corrupt because it did not "protect" the committed mentally ill, as required under the Due Process Clause, from the physical violence of the convicted violent felons hired to care for the committed mentally ill in direct patient care capacities.

392. Governor Deval Patrick and Attorney General Martha Coakley both engaged in corruption in the context of the Davis Case.

393. Governor Deval Patrick was a lawyer and a civil rights lawyer before he was Governor.

394. Governor Deval Patrick was a civil rights litigation attorney for the NAACP before he was Governor.

395. Governor Deval Patrick prepared civil rights cases for argument before the United States Supreme Court while employed at the NAACP.

396. Governor Deval Patrick was the Department Head of the Civil Rights Division of the Department of Justice under President Clinton (1994 -1997).

397. In his inaugural speech at the Civil Rights Division of the Department of Justice then Deputy Attorney General Deval Patrick said this:

> This Nation, as I see it, has a creed. That creed is deeply rooted in the concepts of equality, opportunity and fair play. Our faith in that creed has made us a prideful nation, and enabled us to accomplish feats of extraordinary achievement and uplift. And yet, in the same instant, we see racism and unfairness all around us. **In the same instant, we see acts of unspeakable cruelty and even violence because of race, or ethnicity, or gender, or disability, or sexual orientation. They present a legal problem, to be sure. But they also pose a moral dilemma. How can a nation founded on such principles, dedicated to such a creed, sometimes fall so short?** (emphasis supplied).

398. Attorney General Martha Coakley was a lawyer and a civil rights lawyer before 2014.

399. Attorney General Martha Coakley served as Attorney General for the Commonwealth of Massachusetts from on or about 2007 to 2015.

400. Attorney General Martha Coakley was in charge of the Civil Rights Bureau at the Attorney General's Office from 2007 to 2015.

401. Former Governor Deval Patrick and former Attorney General Martha Coakley both orchestrated a payment to another estate ("Messier Estate") in 2014 which was similarly circumstanced with the Davis Estate insofar as the implicated deceased individual was also willfully and maliciously attacked by State Mental Healthcare Workers during the course of "physical restraints" which went horrible awry in a State operated mental health facility.

402. These restraints were likewise performed by Mental Healthcare Workers who were ill trained, ill qualified and ill tempered.

403. In a November 3, 2017 letter to the Defendant the Davis Estate recounted the corruption of Attorney General Martha Coakley in the context of the Davis and Messier Estate cases:

> Attorney General Coakley specifically informed Massachusetts legislators, in the Spring of 2014, that she was desirous of defeating any legislation which

63

would have resulted in any payment being made to the Davis family. Intermediaries in her office also made her position known to legislators. What type of person, much less Attorney General, would seek to defeat this legislation? Why would any Attorney General ever take this tact especially when she was literally in the midst of insuring that another family's intent based civil rights claims - in an identical legal context - were going to be indemnified? This position runs counter to justice in all its myriad forms. In 2012 Attorney General Coakley authored an 'Op Ed' in the Boston Herald titled 'Society Must Stand Up for the Mentally Ill.' Why did she fail to stand up for Jason Davis? Why did she seek to hurt his cause? Was his cause not a worthy one from her standpoint? It was the 'Blue Wall' which was the crux of precisely why Attorney General Coakley was so steadfast in her resolve to defeat the Davis legislation even while concurrently working feverishly to insure that the Messier Civil Rights claims would be indemnified. Attorneys General Scott Harshbarger and Thomas Reilly litigated the Davis case for seven years (1996-2002). They spent an enormous amount of the taxpayer's time and money to do so. They played "cat and mouse" with Jason Davis over payment and withdrew from the litigation on the very day that they lost in the Supreme Court. (21/1-2); Davis, 178 F. Supp. 2d, at 28-29. They too were steadfast in their resolve that Jason Davis was never going to get any justice in his case. Their actions and the cited empirical data make this all too clear. (46/36-37).

404.  While Governor Deval Patrick and Attorney General Martha Coakley were literally in the midst of feverishly advocating for the Messier Estate to indemnify its federal civil rights claims – in a case legally identical to the Jason Davis case – the Massachusetts' legislative record indicates that Governor Patrick combed through a 36B State budget in order to veto legislation ("Davis Legislation") which would have paid but a paltry fraction ($500,000) of the Davis judgment (Third Amended Judgment) to the Davis Estate. (53/6, 7, 17, 24, 29; 3/1-3).

405.  The Massachusetts Senate (39-0) and House (152-0) unanimously overrode Governor Deval Patrick's veto to try to provide the Davis Estate with this small measure of justice but even it was not funded by the Patrick Administration. (53/6, 7, 17, 24, 29; 3/1-3).

406. The Governor's veto statement, relative to the Davis Legislation, was as follows: "I am vetoing this item because state law [M.G.L. c. 258, §9] prohibits indemnifying employees under these circumstances." (53/17; brackets supplied).

407. This veto statement alone would have prevented Governor Romney from indemnifying the claim in the Dennis R. Smith case under the Indemnfication Statute (M.G.L. c. 258, §9).

408. This veto statement alone would have prevented Governor Patrick from indemnifying the claim by the Messier Estate under the Indemnfication Statute (M.G.L. c. 258, §9).

409. This veto statement alone would have prevented Governor Baker from indemnifying the claim by the Holyoke Victims under the Indemnfication Statute (M.G.L. c. 258, §9).

410. This veto statement alone would have prevented the Executive Branch, the Defendant and Attorney General Andrea J. Campbell from indemnifying the claims by the Blouin Case Victims under the Indemnfication Statute (M.G.L. c. 258, §9).

411. The claims from all four of these cases could not have been and were not indemnified under the Indemnfication Statute as they were and only could have been indemnified under the Executive Branch Custom.

412. Governor Deval Patrick also vetoed the <u>Davis</u> legislation notwithstanding the fact that he specifically advised the Davis family on June 20, 2008 to file legislation as the methodology to sidestep the very authority (M.G.L. c. 258, §9) which Governor Patrick then employed on July 11, 2014 to veto the Davis family legislation. (53/17, 6; 30/1; 44/1-3; 1/1-3).

413. Governor Deval Patrick "duped" the Davis Estate into filing legislation which he then vetoed – after the legislature had passed it – by resorting to the very statute which he

informed the Davis Estate it would sidestep by filing such legislation. (30/1; 44/1-3; 53/17, 6; 1/1-3).

414. The veto was evil, corrupt and violative of the Equal Protection Clause, Due Process Clause and the Executive Branch Custom.

415. Attorney General Coakley was also fast at work, relative to her own corrupt tactics concerning the Davis Case, in the Spring of 2014.

416. On the very day that the Messier Estate settlement was announced by the Massachusetts media (March 26, 2014) the Davis family forwarded an email to Attorney General Coakley which reads as follows:

> Dear Attorney General Coakley:
>
> I read with great interest today's article in *The Boston Globe* by Michael Rezendes regarding the settlement in the Joshua Messier case. As you know, the   Davis v. Rennie case mirrors the tragedy that occurred in the Joshua Messier case. Jason Davis obtained a judgment in 1998 from the Federal District Court here in Boston which now stands at nearly $2.1M which judgment was upheld by the First Circuit Court of Appeals in 2001 and then the U.S. Supreme Court in 2002 through its denial of certiorari. We humbly expect and would respectfully request, given the swift resolution by your office of the Messier case, that you immediately move to pay the judgment on the State's behalf in the Davis v. Rennie case. I would like to meet with you as soon as possible to discuss specifically how this matter could be resolved in the short term. I sincerely appreciate your attention to this matter.
>
> (54/1,1-8; 45/1-18).

417. Attorney General Coakley not only refused to meet with the Davis family – after having initially said that the matter was under review by her office – but then, as noted, specifically informed Massachusetts legislators, in the Spring of 2014, that she was desirous of defeating any legislation which would have resulted in any payment being made to the Davis family. (54/1-8).

418. Intermediaries (Assistant Attorney General Edward Bedrosian amongst them) in her office made her position known to legislators as recounted to the Davis family by State Representative Carolyn Dykema in early 2014. (54/1-8).

419. When Governor Deval Patrick and Attorney General Martha Coakley intentionally inflicted the aforesaid injustices upon the Davis Estate they both engaged in corruption insofar as: (i) they illegally used the Attorney General's and Governor's Offices to benefit the Davis Attackers in direct violation of their constitutional duty to protect committed mentally ill patient Jason Davis and the entire class of committed mentally ill inpatients; (ii) they violated the Equal Protection Clause, Due Process Clause and Executive Branch Custom; (iii) they violated their oaths of office which required them to uphold the Commonwealth's laws which they did not do; (iv) they engaged in conduct which was depraved, debased, morally degenerate and barbaric; (v) they violated State law which forbids the assertion of these types of legal positions by State Attorneys General, on behalf of Governors, because they are adverse to the entire class of committed mentally ill inpatients here in the Commonwealth; and (vi) their conduct was criminal in nature insofar as it violated the criminal arm of the Federal Civil Rights Act. See Clerk of Superior Court for Middlesex County, 386 Mass., at 526; See 18 U.S.C. §242.

420. When the Defendant became Attorney General in 2015 she defended the evil and corrupt "positions" – if they can even be called that – of former Governor Deval Patrick and former Attorney General Martha Coakley in the First Circuit in the context of the second Davis case ("Second Davis Case") filed by the Davis Estate in 2014.

421. The District Court civil action number in this Second Davis Case was 1:14-CV-13427-WGY.

422.   The First Circuit docket number in this Second Davis Case was 14-2306.

423.   The crux of the Second Davis Case was simple: (i) another committed mentally ill inpatient (Joshua Messier) had his federal civil rights willfully and maliciously violated by Massachusetts State employees who were not constitutional officers; (ii) since his rights were willfully and maliciously violated his legal claims were not subject to indemnification under the Indemnification Statute; and (iii) since Joshua Messier's willful and malicious federal civil rights claims were indemnified under the Executive Branch Custom the Davis Estate had an equal right, under the Constitution, to have its willful and malicious civil rights violations indemnified under this same custom.

424.   On February 9, 2015 the Davis family wrote to the Defendant, in her capacity as Attorney General and counsel for Governor Deval Patrick and Attorney General Martha Coakley, imploring her to do justice. (5/1-6).

425.   The Defendant then had long standing knowledge about the barbaric treatment to which Jason Davis and his family had been subjected for more than 22 years having said herself in 2014 that the Davis Case was a "sad situation." (4/1-2; 5/1-6; 3/1-2).

426.   A portion of this February 9, 2015 letter reads as follows:

> Although technically I guess we are 'adversaries' we need not be. We were not in May, 2014. **The Davis case actually presents a series of law and order issues around morality, equality and fair handed justice.** The Davis family has suffered long enough at the hand of the State. It should suffer no longer. I would respectfully request that you, I and Mr. Davis meet in the short term to resolve the Davis case on a footing equal with and in the same manner that the Messier case was resolved. I seek only to save Jason's Father and family from further torment, heartache and trauma of the type and kind which they have endured for the last 22 years. I hope you, Mr. Davis and I can meet in the ensuing days to bring to a conclusion a horrific event that terrifies the Davis family to this day. I invite you to read the entire letter which Mr. Davis remitted to the Massachusetts State Senate on June 20, 2014. It is heart wrenching.I look forward to meeting with you. I respectfully submit that the

taxpayers' money should not, once again, be deployed to deprive Jason Davis' family of the long overdue justice to which it is so richly entitled. **(emphasis in original).**

(5/4; 12/1-4).

427.   The Defendant refused to respond to this letter or meet with the Davis family.

428.   One of the most corrupt aspects of the Second Davis Case is that the Defendant put forth a series of defenses which can only be described as evil, corrupt, acutely fraudulent, scurrilous and unjust as matter of fact and law to advance the evil and corrupt positions of her fellow Democratic power brokers so that they could all "beat" a savagely brutalized committed mentally ill patient in court. See Davis v. Coakley, 802 F. 3d 128 - 134 (1st Cir. 2015); (13/1-16; 40/1-6; 41/1; 42/1-11; 55/1-16; 56/1-14; 59/1; 62/1-36).

429.   There was never a shred of viability as to any one of these defenses as so thoroughly proved in the Petition for Rehearing in Banc, Motion to Supplement Record and to Estop Assertion of Appellate Positions ("Motion to Supplement"), Opening Appellate Brief and Reply Appellate Brief in the Second Davis Case. See Davis, 802 F. 3d, at 128 -134; (13/1-16; 40/1-6; 41/1; 42/1-11; 55/1-16; 56/1-14; 59/1; 62/1-36).

430.   The Defendant cannot insulate her own evil and corrupt conduct from attack by taking refuge in the orders and rulings of this court (Young, J.) or those of the First Circuit panel, which dismissed the Davis Estate's Complaint in the Second Davis Case, insofar as all such rulings and orders are legally and factually baseless and amount to travesties of justice. See Davis, 802 F. 3d, at 128 -134; (13/1-16; 40/1-6; 41/1; 42/1-11; 55/1-16; 56/1-14; 59/1; 62/1-36).

431.   This court did not write any opinion in the Second Davis case; it merely spoke from the bench during the course of a motion session and then entered a one sentence dismissal

order which offered no law or facts in support of such dismissal. (56/1-14; 59/1).

432.   The First Circuit opinion ("First Circuit Opinion") in the Second Davis Case actually includes an array of rulings which no Court in the history of our Nation has ever made or will likely ever make again. See Davis, 802 F. 3d, at 128 -134; (13/1-16; 40/1-6; 41/1; 42/1-11; 55/1-16; 56/1-14; 59/1; 62/1-36).

433.   The First Circuit Opinion and District Court dismissal order directly violated bedrock principles of our Constitution, our Federal Rules of Civil Procedure and common sense. See Davis, 802 F. 3d, at 128 -134; (13/1-16; 40/1-6; 41/1; 42/1-11; 55/1-16; 56/1-14; 59/1; 62/1-36).

434.   The most scurrilous defense asserted by the Defendant in the Second Davis Case – which she knew was fraudulent and scurrilous when she asserted it – was that the culprits who killed Joshua Messier acted only "negligently." See Davis, 802 F. 3d, at 128 -134; (13/1-16; 40/1-6; 41/1; 42/1-11; 55/1-16; 56/1-14; 59/1; 62/1-36).

435.   The assertion of "negligence" paved the way, or so the Defendant thought, for her to then suggest that Joshua Messier could, indeed, have his claims indemnified under the State Indemnification Statute since his culprits only engaged in "negligent" conduct.

436.   If this negligence contention had been true, which it was not, it would have concededly allowed for such indemnification and entirely vitiated the 2014 claims of the Davis Estate.

437.   This negligence assertion was never true and the Defendant knew that when she asserted it in this court and in the First Circuit.

438.   There was a literal avalanche of actual "evidence" cited in the Davis Estate's Complaint in the Second Davis Case which demonstrated that the Messier culprits ("Messier

Culprits") acted willfully, wantonly, recklessly and intentionally including a videotape which actually showed the murder on film, a death certificate which listed the manner of death as homicide, an autopsy which listed the manner of death as homicide, an autopsy which set forth the detailed and acute blunt force trauma injuries all over Joshua Messier's body (including brain bleeding) and the raw fact that staff left a lifeless person (Joshua Messier) to die on a restraint table for ten (10) minutes – without doing anything to help him – after he was savagely attacked by said staff. (13/1-16; 40/1-6; 41/1; 42/1-11; 55/1-16; 56/11, 1-14; 59/1; 62/1-36).

439.  This court and the First Circuit failed to consider any of this evidence in derogation of Fed. R. Civ. P. 12(b)(6) and the Due Process Clause. See Davis, 802 F. 3d, at 128 -134; (13/1-16; 40/1-6; 41/1; 42/1-11; 55/1-16; 56/1-14; 59/1; 62/1-36).

440.  At the Fed. R. Civ. P. 12(b)(6) stage, in this court and in the First Circuit, all the Davis Estate was required to demonstrate was that it had plausible, well-pled and non-conclusory factual allegations in support of its civil claims. See Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 53 (1st Cir. 2013).

441.  The Complaint, in the Second Davis Case, went well beyond just plausible, well-pled and non-conclusory factual allegations insofar as it set forth a detailed evidentiary (medical and legal) proffer which alone warranted a summary judgment on liability and damages in the Davis Estate's favor. (13/1-6; 40/1-6; 41/1; 42/1-11; 55/1-16; 56/1-14; 59/1; 62/1-36).

442.  In the Second Davis Case this court and the First Circuit unconstitutionally deprived the Davis Estate of its right to a jury trial, in violation of the Seventh Amendment, as a result of their complete failure to apply the law as it should have been applied to the Complaint

at the Fed. R. Civ. P. 12(b)(6) stage.

443. This court and the First Circuit entirely disregarded all this "evidence" – which the Davis Estate was not even required to produce at the "Complaint" stage under Fed. R. Civ. P. 12(b)(6) but did so anyway – yet there was still other "evidence" which the First Circuit refused to consider and which the Defendant failed to disclose when the First Circuit appeal was pending.

444. A "smoking gun" arose in the Second Davis Case which the Defendant and her two clients (Deval Patrick and Martha Coakley) were legally obligated to disclose to the Davis Estate but did not.

445. The First Circuit appeal in Davis v. Coakley was docketed on December 9, 2014. (58/4).

446. On April 30, 2015 and while the appeal was still pending - some four (4) months before the panel opinion was rendered and some five weeks before oral argument even took place - a Statewide Grand Jury convened by the Defendant found that the Messier Culprits willfully, wantonly, recklessly and intentionally engaged in criminal conduct which killed Joshua K. Messier on May 4, 2009. (40/1-6; 13/1-16; 55/1-16; 58/1-6).

447. This willful, wanton, reckless and intentional conduct alone foreclosed indemnification under the Indemnification Statute, which permits indemnification only for "negligent" conduct, and renders meaningless the rulings of this Court and the First Circuit in the Second Davis Case. (56/11); Davis, 802 F. 3d, at 128-134.

448. On May 13, 2015 the Davis Estate filed its Motion to Supplement. (58/5; 55/1-16; 13/1-16).

449. This motion sought to include the Six Messier Indictments in the appellate record and prevent the Defendant from contending, as she previously had, that the Messier Culprits

acted only "negligently." (58/5; 55/1-16; 13/1-16).

450.   This motion was never heard, ruled upon, considered or even discussed in the reported opinion rendered on September 18, 2015 by the First Circuit. See Davis, 802 F. 3d, at 128 -134; (58/5, 1-6; 13/1-16; 55/1-16; 57/1-5).

451.   The Davis Estate does not know why this motion was never heard, ruled upon, considered or even discussed in the reported opinion rendered on September 18, 2015 by the First Circuit given: (i) its contention that a judicial finding was, in fact, necessary to conclude that the Messier Culprits engaged in willful or malicious conduct under the Indemnfication Statute; (ii) its May 22, 2014 recitation upon the Docket Sheet that it was deferring consideration of this motion but that it would, in fact, be considered; and (iii) its actual knowledge that the motion was pending. (40/1-6; 13/1-16; 55/1-16; 58/5,1-6; 62/1-36).

452.   Throughout the appeal in the Second Davis Case the First Circuit persistently and incorrectly asserted that no judicial finding had ever been made, concerning the conduct of the Messier Culprits, yet it did not hear, rule upon, consider or even discuss the judicial finding actually made by the Statewide Grand Jury in the Messier criminal case. See Davis, 802 F. 3d, at 128 -134; (13/1-16; 55/1-16; 58/1-6).

453.   The alleged absence of such a judicial finding was the unequivocal bedrock of the First Circuit's Opinion and the ruling of the District Court. Davis, 802 F. 3d, at 134; (56/11, 1-14).

454.   This contention was untrue. (40/1-6; 13/1-16; 55/1-16).

455.   The Six Messier Indictments constituted a per se judicial finding by a Statewide Grand Jury, convened by the Defendant herself, that indemnification under the Indemnfication

Statute was legally impermissible because the Messier Culprits acted willfully, wantonly, recklessly and intentionally. (40/1-6).

456.  The return of the Six Messier Indictments by the Statewide Grand Jury constituted a "belie[f]" by this Statewide Grand Jury, by virtue of "'definite and substantial'" evidence, that "an offense ha[d] been committed. . ." <u>Javon</u>, 403 Mass., at 817 (brackets supplied).

457.  The return of the Six Messier Indictments by the Statewide Grand Jury constituted a judicial finding that the Messier Culprits willfully, wantonly, recklessly and intentionally engaged in criminal conduct which murdered Joshua K. Messier on May 4, 2009 thus taking such conduct outside of the ambit of indemnification under the Indemnification Statute. <u>Id</u>, at 817; M.G.L. c. 258, §9; (40/1-6; 13/1-16; 55/1-16).

458.  The "belief" by the Statewide Grand Jury, that the Messier Culprits committed violations of M.G.L. c. 265, §13 and M.G.L. c. 265, §37 by definite and substantial evidence, concurrently demonstrated that the allegations in the Davis Estate's 2014 Complaint "plausibly" asserted that the Messier Culprits engaged in willful, wanton, reckless and intentional conduct which is all the Davis Estate had to demonstrate at the Fed. R. Civ. P. 12 (b)(6) stage. <u>Javon</u>, 403 Mass., at 817; (40/1-6; 13/1-16; 55/1-16).

459.  The First Circuit entirely ignored this evidence in its opinion as it violated both Fed. R. Civ. P. 12(b)(6) and the Seventh Amendment. (13/1-16; 55/1-16; 58/1-6; 62/1-36); <u>See Davis</u>, 802 F. 3d, at 128 -134.

460.  The Six Messier Indictments legally foreclosed the Defendant from even asserting that the Messier Culprits acted only "negligently" because in a criminal court, right down the street from the First Circuit, the Defendant *herself* convened a Statewide Grand Jury

which found that the Messier Culprits acted willfully, wantonly, recklessly and intentionally when they murdered Joshua Messier. (40/1-6).

461.   Depending upon what courthouse the Defendant found herself in on any particular day, in her capacity as Attorney General, she argued for the use of diametrically opposed legal culpability standards (negligence v. willful conduct) so she could win in the court where she found herself.

462.   This conduct violated the principles of "judicial estoppel" and was illegal, unconstitutional and criminal. See New Hampshire v. Maine, 532 U.S. 742, 749-750 (2001); 18 U.S.C. §242; M.G.L. c. 266, §30.

463.   Litigants are legally foreclosed from arguing diametrically opposed legal theories in two different courts at the same time on the same issue in the same case which is precisely what the Defendant did. Id.

464.   The Messier Culprits simply could not have acted "negligently" at the same moment that a Statewide Grand Jury found that they acted willfully, wantonly, recklessly and intentionally.

465.   Even though a judicial finding had, in fact, been made by a Statewide Grand Jury - convened by the Defendant herself - the First Circuit saw fit to conclude that since no judicial finding had ever been made, to the effect that the Messier Culprits had acted willfully, wantonly, recklessly and intentionally, it followed as a matter of law that the Messier Culprits had acted only negligently. See Davis, 802 F. 3d, at 134.

466.   No court in the history of the United States has ever ruled that the mere absence of a judicial finding in a particular matter dictates, as a matter of law, that the culprits at issue must have acted only in a "negligent" manner. (13/1-16; 55/1-16).

467.    The First Circuit expressly and unconstitutionally ruled as such in the Second Davis Case. <u>Davis</u>, 802 F. 3d, at 134.

468.    If this were true than the 200,000 unsolved murders here in the United States would all be considered to have been "negligently" committed which conclusion would be legally untrue and legally unsupportable. (13/1-16; 55/1-16).

469.    The First Circuit ignored the Six Messier Indictments and the judicial estoppel argument in its opinion both of which would have exerted a dispositive effect on Second Davis Case appeal. <u>Id</u>., at 128-134; (40/1-6; 13/1-16; 55/1-16; 58/1-6; 62/1-36).

470.    The First Circuit also held that the liability denials by the Messier Culprits, within the four corners of the Messier settlement agreement ("Messier Settlement Agreement"), dictated, as a matter of law, that they had acted only "negligently." <u>Davis</u>, 802 F. 3d, at 134; (39/1-11).

471.    No court in the history of the United States has ever ruled that mere liability denials in settlement documents dictate, as a matter of law, that that the released parties acted only "negligently."

472.    The First Circuit expressly and unconstitutionally ruled as such in the Second Davis Case. <u>Davis</u>, 802 F. 3d, at 134.

473.    The ***actual evidence*** produced at the Complaint stage in the Second Davis Case ***actually proved*** that since the Messier Culprits acted willfully, wantonly, recklessly and intentionally this foreclosed indemnification under the Indemnfication Statute.

474.    Since indemnification of the claims asserted against the Messier Culprits could only have been effected through the Executive Branch Custom – which provided indemnification for willful claims – this dictates that Davis Estate had the right to be

treated equally.

475.  The alleged absence of a judicial finding in the Second Davis Case was a grave legal error by the First Circuit for four reasons: (i) there was, in fact, a judicial finding made by a Statewide Grand Jury which the First Circuit ignored; (ii) "judicial findings" are not even required, on the face of the Indemnification Statute, prior to indemnifying a public employee (See supra); (iii) the Davis Estate was actually entitled to have a judicial finding made by the District Court jury in the Second Davis Case relative to the level of the culpability of the Messier Culprits in accord with the Seventh Amendment and Markman v. Westview Instruments, Inc., 517 U.S. 370, 376 (1996); and (iv) requiring the Davis Estate to prove that a judicial finding had been made, in the Indemnification Statute context, violated the fair notice provision of the Due Process Clause since this requirement is not found on the face of the statute or in its interpretive caselaw.

476.  The Six Messier Indictments constituted a per se judicial finding by a Statewide Grand Jury. (40/1-6).

477.  In the Second Davis Case the First Circuit held that "we have no basis in the record to conclude that any such torts [committed by the Messier Culprits] were committed in a grossly negligent, willful, or malicious manner." Davis, 802 F. 3d, at 134 (brackets supplied).

478.  This holding has no basis in fact or law and was made in the face of a literal avalanche of actual evidence as set forth in: (i) the 77 page Complaint in the Second Davis Case which contained not only an excruciatingly detailed evidentiary proffer (medical and legal) but incorporated 26 exhibits as well which totaled another 249 pages; and (ii) the

Six Messier Indictments. (13/1-16; 40/1-6; 41/1; 42/1-11; 55/1-16; 59/1; 62/1-36).

479.   It is readily apparent that in the Second Davis Case this court and the First Circuit misstated the law, misapplied the law, misunderstood the law, misunderstood the facts, misunderstood the claims and generally evidenced an absence of a comprehensive understanding as to precisely how the various sections of M.G.L. c. 258 work and interrelate with each other. Davis, 802 F. 3d, at 128-134; (56/11,1-14; 40/1-6; 41/1; 42/1-11; 13/1-16; 55/1-16; 58/1-6; 59/1; 62/1-36).

**480.   It is patently manifest that the rulings of this court and the First Circuit in the Second Davis Case were legally and factually baseless and not such that the Defendant can now take refuge in them to insulate herself from her own evil and corrupt conduct.**

481.   The Defendant knew her defenses in the Second Davis Case were evil, corrupt, acutely fraudulent, scurrilous and unjust as matter of fact and law when she asserted them but she was bent on "beating" a savagely brutalized committed mentally ill patient in court while advancing the evil and corrupt legal positions of Governor Deval Patrick and Attorney General Martha Coakley.

482.   The Defendant's contention, that the Messier Culprits acted only negligently, was a legal contention which was evil, corrupt, acutely fraudulent, scurrilous and entirely inconsistent with the Six Messier Indictments returned through the Statewide Grand Jury which Defendant *herself* convened.

483.   This legal contention evidenced a "win at any cost" mentality even if it meant wrongfully and evilly depriving a committed mentally ill inpatient (Jason Davis) of justice which he had then sought for some 22 years (1993-2015).

484.    The legal position constituted a crime under the criminal arm of the Federal Civil Rights Act. See 18 U.S.C. §242.

485.    When then Attorney General Maura Healey asserted her evil, corrupt, acutely fraudulent and scurrilous legal defenses in this court and in the First Circuit she engaged in corruption insofar as: (i) she engaged in fraud by failing to disclose the Six Messier Indictments and asserting that the Messier Culprits only engaged in negligent conduct; (ii) she illegally used the Attorney General's Office to again benefit the Davis Attackers in direct violation of her constitutional duty to protect committed mentally ill patient Jason Davis and the entire class of committed mentally ill inpatients; (iii) she illegally used the Attorney General's Office to advance the evil and corrupt legal positions of Governor Deval Patrick and Attorney General Martha Coakley to the detriment of committed mentally ill inpatient Jason Davis and the entire class of committed mentally ill inpatients who she was constitutionally required to protect; (iv) she violated her oath of office which required her to obey the Commonwealth's laws which she did not do; (v) she asserted positions which were depraved, debased and morally degenerate; and (vi) she violated State law which forbids the assertion of these types of defenses by State Attorneys General because they are adverse to the entire class of committed mentally ill inpatients here in the Commonwealth. See Clerk of Superior Court for Middlesex County, 386 Mass., at 526.

486.    The Davis Estate requested the Defendant to help it obtain justice on May 10, 2014. (4/1-2).

487.    The Davis Estate requested the Defendant to help it obtain justice on February 9, 2015. (5/1-6).

488.     The Davis Estate requested the Defendant to help it obtain justice on October 13, 2022.
         (6/1; 7/1-2).

489.     The Davis Estate requested the Defendant to help it obtain justice on October 18, 2022.
         (8/1).

490.     The Davis Estate requested the Defendant to help it obtain justice on January 20, 2023.
         (3/1-23).

491.     On each of these dates the Defendant refused to help the Davis Estate obtain justice
         despite holding herself out to be a Civil Rights Advocate.

492.     On each of these dates the Davis Estate sought assistance from the Defendant, while
         she was an Assistant Attorney General, Attorney General and now as Governor, so that
         she could advocate for the Davis Estate just as Governor Deval Patrick and Attorney
         General Martha Coakley had advocated for Joshua Messier's Estate in 2014, just as
         Governor Charlie Baker had advocated for the Holyoke Victims in 2022 and just as she
         and Attorney General Andrea J. Campbell advocated for the Blouin Case Victims in
         August of 2023.

493.     The Defendant refused the Davis Estate's numerous pleas for help in obtaining the
         equal handed justice compelled by the Constitution.

494.     The Defendant was never truly interested in helping the Davis Estate obtain justice and
         rightfully obtain the full amount of the Third Amended Judgment due under the
         Constitution but she was, instead, only interested in embracing, renewing, protecting,
         perpetuating and covering up the Corruption inflicted upon Jason Davis and his estate,
         including her own, which was one of the primary reasons she Refused to honor the
         relief sought in the Constitutional Demand Letter.

495.   The Refusal, in and of itself, amounts to Corruption since there is no legal basis for it insofar as the Equal Protection Clause, Due Process Clause and the Executive Branch Custom compel the relief sought in the Constitutional Demand Letter.

496.   As of, on and after February 19, 2023, when the Refusal became official under the terms of the Constitutional Demand Letter, the Refusal embraced, renewed, protected, perpetuated and covered up the Corruption, including Defendant's own corruption, which proximately caused: (i) Plaintiff to be deprived of its aforesaid constitutional rights in 2023; and (ii) Plaintiff to sustain the aforesaid injuries, injuries in fact and damages including, to wit, failure to receive indemnification under the Executive Branch Custom in the amount of 2.57M.

497.   Defendant's Refusal, which embraced, renewed, protected, perpetuated and covered up the Corruption including her own, implements an exponentially more outrageous, malicious, callous, wanton and evil Discrimination by Defendant, relative to three similarly circumstanced claimants (Davis Estate, Holyoke Victims and Blouin Case Victims), which discrimination proximately caused: (i) Plaintiff to be deprived of its aforesaid constitutional rights in 2023; and (ii) Plaintiff to sustain the aforesaid injuries, injuries in fact and damages including, to wit, failure to receive indemnification under the Executive Branch Custom in the amount of 2.57M.

498.   The Refusal is the capstone piece of the thirty (30) year chain of legally documented and unbroken governmental corruption insofar as it is expressly aimed at permanently ensuring that the Davis Estate will never obtain justice.

499.   The Defendant's Refusal to provide justice to a savagely brutalized mentally ill patient, in Jason Davis' precise circumstance, perpetuates and constitutes corruption and

proximately violates the Due Process Clause, Equal Protection Clause and the Executive Branch Custom.

500. The Refusal protects the Davis Attackers and all those whose Corruption has been outlined herein.

501. The Corruption committed by Attorney General Scott Harshbarger, Attorney General Thomas Reilly, Attorney General Martha Coakley, Attorney General Maura Healey, Governor Deval Patrick and Governor Maura Healey protects the Davis Attackers and was renewed and perpetuated through the Refusal.

502. The sitting Attorney General, Andrea J. Campbell, was also requested on February 28, 2023 ("AG Letter") to end this 30 year unbroken chain of legally documented governmental corruption, stand with the Davis Estate and provide it with justice but she too would not do so consistent with the time honored corruption committed by her four immediate predecessors and Governor Deval Patrick. (43/1-2; 47/1-17; 49/1-5).

503. Attorney General Andrea J. Campbell chose, instead, to extend the legally documented and unbroken chain of governmental corruption which goes back 30 years in the Jason Davis case.

504. The opening sentences of the AG Letter read as follows:

> Dr. King once said that **"In the End, we will remember not the words of our enemies, but the silence of our friends."** One of the most disturbing aspects of this thirty (30) year Federal Civil Rights struggle *has been* the utter silence of "our friends" in this deep blue State. In fact, "our friends" have not only been totally silent but have, in addition, actually engaged in affirmative measures to corruptly insure that Jason Davis – a committed mentally ill inpatient who was beaten half to death by convicted violent felon employees on August 12, 1993 – never gets justice. See <u>Davis v. Rennie</u>, 264 F. 3d 86 (1st Cir.  2001); <u>Davis v. Rennie</u>, 997 F. Supp. 137 (D. Mass. 1998); <u>Davis v. Rennie</u>, 535 U.S. 1053 (2002). However, your central campaign themes filled my client and I with hope. These themes actually

drove us to forward this letter to you. We have a thirty (30) year chain of documented governmental corruption which we need to break in the context of the Jason Davis case. We need your help to break it and to finally provide justice to the Davis family. Nobody has stood up to this chain of corruption before. Likewise, nobody in the Executive Branch has ever advocated for Jason Davis or even acknowledged the atrocity which is the Jason Davis case. **(emphasis in original).** (47/1).

505.  After the initial April 10, 2023 meeting with the Attorney General's Office the Davis Estate and family were literally "frozen out" by Attorney General Andrea J. Campbell and First Assistant Patrick Moore insofar as both of them simply refused to further communicate. (43/1-2; 49/1-5; 60/1-2; 61/1; 48/35-36).

506.  On the day when the Blouin Case settlement was announced (8.11.23) the Davis Estate reached out again to urge the Executive Branch, through its sitting Attorney General and First Assistant, to do right by the Davis Estate just as the Attorney General had done right by the Blouin Case Victims. (61/1).

507.  The Attorney General and her First Assistant have persisted with their silence from April 10, 2023 to present date. (43/1-2; 47/1-17; 48/35-36, 1-39; 49/1-5; 60/1-2; 61/1).

508.  The disdain for the Davis Case and corruption committed by the Massachusetts Executive Branch is so pervasive, acute and time honored that Executive Branch constitutional officers, including Governor Healey and Attorney General Andrea J. Campbell, will not even assist the Davis family in filing State legislation and perpetuating previously filed federal legislation (116 H.R. 9060 – Representative Joseph P. Kennedy, III) in order to protect the committed mentally ill from being killed, maimed or injured by the hand of the State. (48/35-39, 1-39; 46/52-54, 1-60).

509.  These two legislative proposals, both authored by the Davis Estate, are aimed at making States financially accountable when they kill, maim or injure the committed

mentally through their evil, willful, malicious, wanton, reckless and intentional conduct. (48/35-39, 1-39; 46/52-54, 1-60).

510. The federal proposal constitutes a one sentence supplementation to the Federal Civil Rights Act (42 U.S.C. §1983) which, when enacted, will protect the committed mentally ill and otherwise become one of the most important pieces of Federal Civil Rights legislation to be enacted since 1871. (48/35-38, 1-39).

511. The State proposal constitutes a new section of M.G.L. c. 258 (M.G.L. c. 258, 9B) which, when enacted, will protect the committed mentally ill. (48/35-36, 39).

512. These legislative proposals will literally save lives through raw accountability. (48/35-39, 1-39; 46/52-54, 1-60).

513. The Defendant has always "honored" the historical position of the Massachusetts Attorney General's Office: that neither Jason Davis nor his Estate should ever obtain justice irrespective of the fact that the Constitution commands this very result.

514. The Defendant's Refusal renews and corruptly "honors" this position.

515. The Massachusetts Attorney General's office, and the Defendant in particular, has always had great disdain for the Davis Case which the Defendant renewed through the Refusal.

516. It was Jason Davis and his pesky lawyers, after all, who refused that unconstitutional, criminal, unethical, depraved, debased and morally degenerate offer of $500,000 made by Attorney General Harshbarger and then went on to defeat the Massachusetts' Attorneys General relative to their corrupt legal issues, in a one-month federal trial and in two federal appeals obtaining a judgment which now stands at 2.57M; more than five times the amount of the depraved informal mediation offer.

517.    The reported opinions from the District Court Proceeding and from the initial First Circuit case also cite an array of legal errors committed by the Massachusetts Attorney General's Office to pour even more salt on the Commonwealth's already open and self-inflicted wound. <u>Davis</u>, 264 F. 3d, at 86-117; <u>Davis</u>, 997 F. Supp., at 137-140.

518.    The Davis Case was and is a great source of embarrassment, humiliation and anger for the Attorneys General of this State which has colored their conduct and Defendant's conduct toward Jason Davis, his family and lawyers.

519.    The Attorneys General simply could not "shake" Jason Davis even with their bottomless pit of money, unlimited legal resources and corrupt shenanigans.

520.    Instead of using the <u>Davis</u> case as a teaching tool – a great volume of mental health corrective safety measures were proposed on pages 52-54 in the 11.3.17 letter sent to Defendant – she and her cohorts have simply sought to inflict pain, torment and suffering upon the Davis family since 1993 while insuring that perpetual injustice would always be inflicted upon it. (46/52-54, 1-60; 48/35-39, 1-39).

521.    The Attorney General's Office has been very successful in this regard.

522.    The Defendant has been a substantial part of this process which she perpetuated and renewed through her Refusal.

523.    The Defendant is the most "important" reason in the World that Jason Davis, his estate and family never got justice or the payment of the 2.57M owed under the Third Amended Judgment and the Constitution.

524.    The Defendant's pivotal role, in this regard, was renewed through the Refusal.

525.   The Defendant could not speak truth to power when Governor Deval Patrick and Attorney General Martha Coakley prevailed upon her to advance their evil and corrupt positions in the First Circuit.

526.   The Defendant looked away from the Jason Davis tragedy though she knew, in her own words, that the Davis case was "a sad situation."

527.   The Davis Case was not "sad" enough though for the Defendant to seek justice for Jason Davis, do what Constitution commanded, do what was right or speak truth to power.

528.   At the precise time that the Defendant was informing the Davis family that the Davis Case was a "sad situation" the Defendant knew that her boss (Attorney General Martha Coakley) was then advocating for the Messier Estate while concurrently informing State legislators that the Davis Estate should get no justice whatsoever.

529.   The Defendant has done everything in her power to ensure that Jason Davis, his Estate and family never get justice which objective was renewed through her Refusal.

530.   The Defendant acted outrageously, maliciously, callously, wantonly and evilly relative to her deprivations the Plaintiff's constitutional rights.

531.   The Defendant's conduct was extreme and outrageous and prompted by ill will.

532.   The Defendant's conduct was motivated by an evil motive, intent and eye.

533.   The Defendant's conduct was motivated by an unequal hand and the Corruption.

534.   The Defendant had a malicious design and intent to and did, in fact, deprive Plaintiff of the privileges, rights and immunities, which were secured and guaranteed to it by the Constitution and the laws of the United States, such design and intent being implemented by her.

Wherefore, it is demanded that:

A.  This Honorable Court enter judgment for the Plaintiff on all claims for the amount owed under the Third Amended Judgment, accumulated interest and all other damages sustained by the Plaintiff;

B.  The Plaintiff be awarded compensatory damages in the amount of $2,574,901 together with per diem interest of $139.40 up to and including the date of payment;

C.  The Plaintiff be awarded prejudgment and postjudgment interest;

D.  The Plaintiff be awarded attorneys' fees, costs, taxable costs, taxable expenses and expenses pursuant to 42 U.S.C. § 1988 and applicable federal rules of civil procedure;

E.  The Plaintiff be awarded punitive damages against the Defendant in an amount no less than $23,000,000; and

F.  The Plaintiff be awarded punitive damages in an amount which is at the outer most limit of permissibility under the Due Process Clause of the Fourteenth Amendment.

## **JURY CLAIM**

The Plaintiff demands a trial by jury on all counts, claims and issues so triable.

THE PLAINTIFF,
WILLIAM H. DAVIS, IN HIS CAPACITY AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JASON DAVIS,
BY HIS ATTORNEYS,

By: /s/ *Christopher M. Perry*
Christopher M. Perry, Esquire
Brendan J. Perry & Associates, P.C.
95 Elm Street
P.O. Box 6938
Holliston, MA 01746
Phone: (508) 429-2000
Facsimile: (508) 429-1405
e-mail: cperrylaw@gmail.com
B.B.O. #552203